757 A.2d 884

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Brett Eugene STRICKLER, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 17, 1999.

Decided Aug. 24, 2000.

48

52

Arla M. Waller, Public Defender's Office, for Brett Eugene Strickler.

Jaime Keating, Dist. Atty.'s Office, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

The issue presented is whether, pursuant to the Fourth Amendment to the United States Constitution, evidence seized from a vehicle during the course of a consent search was properly suppressed.

On May 26, 1995, at approximately 12:40 a.m., a uniformed officer of the Upper Allen Township Police Department was on routine patrol in a marked vehicle, traveling on Fisher Road in a rural area, when he saw a car parked at the side of the road, alongside the lawn in front of a farmhouse and barn. Standing about fifteen feet from the parked car were two men who appeared to be urinating. The officer pulled in behind the parked car with the intent, as he explained at the suppression hearing, to ascertain what was happening and whether anything was wrong. He stepped out of his vehicle and approached the individuals, noticing, as he passed their car, that it contained a cooler containing unopened beer cans. When the officer asked the men what they were doing, they replied that they were coming from the races at the Williams Grove Speedway and had stopped to urinate. The officer asked to see their driver's licenses, which they produced, and returned to his vehicle to check on the validity of the licenses and to determine whether there were outstanding warrants for either of the men. As he was conducting the license check, a fellow officer arrived and parked his vehicle behind the patrol car. After verifying that the licenses were valid and that there were no warrants for either of the two men, the officer stepped back out of his cruiser; called defendant/appellant Brett Strickler (the owner and operator of the parked car) over to him; returned Strickler's driver's license to him; advised him that it was not appropriate to stop along the road and urinate on someone else's property; thanked him for his cooperation; and began walking toward his cruiser. At that point, he later testified, Strickler was free to go, although there is no evidence that he informed Strickler of that fact.

After taking a few steps toward his car, the officer turned around and asked Strickler if he had anything illegal in his car. When Strickler answered that he did not, the officer then asked him "if he wouldn't mind if I took a look through his car." As the officer testified at the suppression hearing, he had no reason to suspect Strickler of having any form of contraband in the car. Nevertheless, his reason for request-

ing Strickler's consent to search was "[t]o see if there was anything illegal in his car." In response to the request, [Strickler] hesitated. He stood there and looked at me and looked at [the officer] who assisted me at the scene, and I explained to him, you know, he didn't have to say yes, you know, and then I asked him again. After saying that, I said, Do you mind. Is it okay with you if we just take a quick search of your vehicle[?]

At that point, Strickler consented to a search. Upon searching the car, the officer found, between the console and the front passenger seat, an object that looked and smelled like a marijuana smoking pipe. Strickler was arrested and charged with possession of drug paraphernalia, 35 P.S. § 780-113(a)(32).

Strickler filed a pre-trial motion to suppress the marijuana pipe on the grounds that the arresting officer, having had no reasonable belief that a crime had occurred or was occurring, had impermissibly requested his consent to a search, and, in addition, that any search for drug paraphernalia was outside the scope of the consent that he gave. The suppression court conducted a hearing, at which the Commonwealth elicited the testimony of the arresting officer, and Strickler presented no witnesses or other evidence. At hearing, the court expressed reservations about relying upon any admonition by the officer concerning the voluntariness of the consent. N.T., Nov. 2, 1995, at 18 (stating that "[w]hen an officer asks somebody, you know, to do something, they don't—I don't expect the Defendant to be familiar with Constitutional law or something[;] [u]sually when an officer asks you something, this idea that well, he didn't have to, that's really meaningless to a large extent"). The court subsequently granted the suppression remedy, finding the case analogous to *Commonwealth v. Lopez*, 415 Pa.Super. 252, 609 A.2d 177 (1992), in which the Superior Court deemed the consent to a vehicle search involuntary and directed that the fruits of the search be suppressed. The suppression court determined that the officer's initial detention of Strickler and his companion to ascertain what they were doing had been proper, but the subsequent request to search the car, coming as it did after the purpose of

such detention had been accomplished, was illegal as it was not based on reasonable suspicion or probable cause. The court concluded that such illegality tainted Strickler's subsequent consent.

■ On appeal, the Superior Court concluded, on the basis of its decision in *Commonwealth v. Hoak*, 700 A.2d 1263 (Pa.Super.1997) (*en banc*), *aff'd by an equally divided court*, 557 Pa. 496, 734 A.2d 1275 (1999), that the trial court had erred in granting Strickler's suppression motion. Acknowledging that the Upper Allen Township police officer had not informed Strickler that he was free to go, the Superior Court reasoned that the officer's actions preceding the request for consent to search had nevertheless clearly communicated to Strickler that the traffic stop, and therefore Strickler's detention, had ended. The Superior Court's assessment entailed a broader evaluation of the relevant circumstances, proceeding as follows:

> [F]ollowing the conclusion of the initial stop, the officer began to walk back to his car, but then turned and asked [Strickler] if he had anything illegal in his car and if he would consent to a search. Although [Strickler] initially hesitated, when the officer explained that he did not have to consent, [Strickler] agreed to the search. As the *Hoak* court determined, absent some coercive conduct, we find this questioning of [Strickler] did not automatically transform the non-coercive encounter into an unlawful seizure or detention. Importantly, ... the record shows that there were only two officers at the scene. Also, [the arresting officer] testified that when he asked [Strickler] for permission to search his car, he neither threatened [Strickler] in any way nor raised his voice. [The officer] further stated that he did not take out his gun or show any sign of force, nor did [the other officer] do so. Moreover, there is no evidence that the officers physically touched or came into contact with [Strickler].

Under such circumstances, the court stated that the trial court's determinations that Strickler was subject to an unlawful detention and that his consent was involuntary were un-

justified. Accordingly, the Superior Court reversed the suppression order and remanded the case for further proceedings. This Court allowed appeal to address the merits of the trial and appellate courts' conflicting approaches to a consent search following an investigative detention.[1]

The Fourth Amendment protects against unreasonable searches and seizures, including those entailing only a brief detention. *See United States v. Mendenhall*, 446 U.S. 544, 551, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497 (1980)(opinion announcing the judgment of the Court).[2] A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). One such exception is consent, voluntarily given. *See id.* at 219, 93 S.Ct. at 2043–44. The central Fourth Amendment inquiries in consent cases entail assessment of the constitutional validity of the citizen/police encounter giving rise to the consent; and, ultimately, the voluntariness of consent. *See id.; see also Commonwealth v. Cleckley*, 558 Pa. 517, 528, 738 A.2d 427, 433 (1999).[3]

1. Appellate review of an order granting suppression entails adherence to the suppression court's factual findings to the extent that they are supported by the record; consideration of the evidence offered by the defendant and so much of the Commonwealth's evidence as remains uncontradicted when read in the context of the entire record; and *de novo* review of the legal conclusions drawn from such evidence. *See Commonwealth v. Pickron*, 535 Pa. 241, 246, 634 A.2d 1093, 1096 (1993).

2. Although the lead opinion in *Mendenhall* merely announces the judgment of the Court, the pertinent principles from that opinion were endorsed by a majority of Justices in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). *See id.* at 502, 103 S.Ct. at 1326 (four-Justice plurality opinion)(endorsing the *Mendenhall* standard); *id.* at 514, 103 S.Ct. at 1332–33 (Blackmun, J., dissenting)(indicating that "I concur in the plurality opinion's adoption of the Fourth Amendment 'seizure' standard proposed by Justice Stewart in *Mendenhall* "). This Court enunciated an essentially equivalent set of principles in *Commonwealth v. Jones*, 474 Pa. 364, 373, 378 A.2d 835, 840 (1977), a decision which preceded *Mendenhall;* the Court specifically endorsed the pertinent principles from *Mendenhall/Royer* in *Commonwealth v. Matos*, 543 Pa. 449, 457–58, 672 A.2d 769, 773–74 (1996).

3. In *Cleckley*, this Court described the genesis of the voluntariness focus in the Fourth Amendment context, and the rationale supporting a

Where the underlying encounter is found to be lawful, voluntariness becomes the exclusive focus. Where, however, a consensual search has been preceded by an unlawful seizure, the exclusionary rule requires suppression of the evidence obtained absent a demonstration by the government both of a sufficient break in the causal chain between the illegality and the seizure of evidence, thus assuring that the search is not an exploitation of the prior illegality, and of voluntariness. *See Royer*, 460 U.S. at 497, 501, 103 S.Ct. at 1323, 1326.[4]

 Accordingly, in assessing the lawfulness of citizen/police encounters, a central, threshold issue is whether or not the citizen-subject has been seized. Instances of police questioning involving no seizure or detentive aspect (mere or consensual encounters) need *not* be supported by any level of suspicion in order to maintain validity.[5] Valid citizen/police

departure from a waiver construct requiring "an intentional relinquishment or abandonment of a known right or privilege," *see Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); reviewed the determination in *Schneckloth*, 412 U.S. at 235–36, 93 S.Ct. at 2051–52, to the effect that, while the waiver analysis appropriately applies to safeguard constitutional guarantees involving the preservation of a fair trial of criminal defendants, it does not pertain to the wholly different protections of the Fourth Amendment, *see Cleckley*, 558 Pa. at 522–24, 738 A.2d at 430–31; and concluded that the federal voluntariness standard adequately protects the privacy rights guaranteed under Article I, Section 8 of the Pennsylvania Constitution. *See id.* at 528, 738 A.2d at 433.

4. *See generally* 3 WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 8.2(d), at 656 (3d ed.1996) (stating that "[t]he fruit of the poisonous tree doctrine also extends to invalidate consents which are voluntary")[hereinafter "LaFAVE, SEARCH AND SEIZURE"]. Such treatment is analogous to that applicable in the Fifth Amendment context. *See generally Dunaway v. New York*, 442 U.S. 200, 219, 99 S.Ct. 2248, 2260, 60 L.Ed.2d 824 (1979) (concluding that defendant's confession should have been suppressed, as "[n]o intervening events broke the connection between [defendant's] illegal detention and his confession"); *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) (same); *Wong Sun v. United States*, 371 U.S. 471, 486–88, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963)(requiring, in the context of a Fifth Amendment violation, not only that the standard of voluntariness be met, but also that the defendant's statement be "sufficiently an act of free will to purge the primary taint").

5. *See generally Florida v. Bostick*, 501 U.S. 429, 434–35, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (explaining that, even when the officers have no basis for suspecting criminal involvement, they may generally

interactions which constitute seizures generally fall within two categories, distinguished according to the degree of restraint upon a citizen's liberty: the investigative detention or *Terry* stop, which subjects an individual to a stop and a period of detention but is not so coercive as to constitute the functional equivalent of an arrest; and a custodial detention or arrest, the more restrictive form of permissible encounters. *See Ellis*, 541 Pa. at 294, 662 A.2d at 1047. To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion; *see Commonwealth v. Lewis*, 535 Pa. 501, 508, 636 A.2d 619, 623 (1994) (citation omitted); whereas, a custodial detention is legal only if based on probable cause. *See Ellis*, 541 Pa. at 294, 662 A.2d at 1047. To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877; *Royer*, 460 U.S. at 502, 103 S.Ct. at 1326–27. *See generally supra* note 2.[6] In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in

ask questions of an individual "so long as the police do not convey a message that compliance with their request is required"); *Immigration and Naturalization Serv. v. Delgado*, 466 U.S. 210, 216–17, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984); *Royer*, 460 U.S. at 497–98, 103 S.Ct. at 1323–24 ("[i]f there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed"); *Commonwealth v. Ellis*, 541 Pa. 285, 293–94, 662 A.2d 1043, 1047 (1995).

**6.** In *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the United States Supreme Court enunciated a modified construct for determining when a seizure has occurred, indicating that physical force or a submission to an assertion of authority is necessary. *See id.* at 625–26, 111 S.Ct. at 1550. This Court, however, has deemed such modified standard inconsistent with Article I, Section 8 of the Pennsylvania Constitution and, accordingly, directed adherence to the *Mendenhall/Royer* standard. *See Matos*, 543 Pa. at 459, 672 A.2d at 774.

some way been restrained. *See Mendenhall,* 446 U.S. at 553, 100 S.Ct. at 1877.[7] In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.[8]

In the present case, Strickler does not dispute that his initial encounter with the Upper Allen Township police constituted a lawful investigative detention, or that the arresting officer had the requisite reasonable suspicion to support such initial seizure.[9] Strickler contends, however, that once the officer made the decision not to cite him for his conduct and had returned his driver's license to him, the investigation was

7. *See also Michigan v. Chesternut,* 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)(characterizing as the core inquiry whether the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business"); *Lewis,* 535 Pa. at 508, 636 A.2d at 623. Parenthetically, the Supreme Court has fashioned a modified construct governing instances in which the restraint of the citizen-subject's movement results from factors independent of the encounter with police, for example, his location on a commercial bus. *See Bostick,* 501 U.S. at 439, 111 S.Ct. at 2389 (articulating the appropriate test for determining whether a seizure had occurred as "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter").

8. The Supreme Court has explained its admonition that there is no "litmus-paper test for distinguishing a consensual encounter from a seizure," *Royer,* 460 U.S. at 506, 103 S.Ct. at 1329, as follows:

 The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

 *Chesternut,* 486 U.S. at 574, 108 S.Ct. at 1979.

9. Nor would it appear that any such argument could be sustained. The arresting officer testified that he observed Strickler and his companion urinating beside a public roadway adjacent to a farm property, which, under prevailing precedent, may be treated as the predicate for the summary offense of disorderly conduct. *See Commonwealth v. Williams,* 390 Pa.Super. 493, 506–07, 568 A.2d 1281, 1288 (1990). *See generally State v. Villarreal,* 97 Wash.App. 636, 984 P.2d 1064, 1067–68 (1999)(finding that an officer's observation of public urination provided reasonable suspicion supporting an officer's investigation of disorderly conduct).

complete and the purpose of the lawful detention fully achieved. As there were no facts or circumstances that could have given rise to a reasonable suspicion of independent criminal activity sufficient to justify further detention, Strickler argues, essentially, that the initial, valid detention evolved into a second, unreasonable and unlawful one. According to Strickler, the asserted second detention entailed coercive aspects that rendered his ostensible consent to the search involuntary. As Strickler urges a determination that his encounter with the police was illegal, acceptance of his argument would impose the burden upon the Commonwealth of demonstrating not only voluntariness, but also, a break in the chain of illegality prior to the rendering of his consent.

Situations involving a request for consent to search following an initial lawful detention have posed difficult analytical questions for courts, *see, e.g., Commonwealth v. Sierra,* 555 Pa. 170, 723 A.2d 644 (1999)(equally divided Court), and have been the subject of extensive commentary. *See generally* 4 LaFave, Search and Seizure § 9.3, at 85–135. Frequently the argument is made in such cases that, although the initial detention may be constitutionally valid, some warning or admonition should be given to ameliorate the coercive aspects of the initial detention and prevent them from infecting the subsequent request for consent. Thus, in the context of a traffic or similar stop, once the purpose for the stop has been completed, the question arises: Does the individual have objective reasons to believe that he is (or is not) free to end the police/citizen encounter? The decisions of the Ohio Supreme Court and the United States Supreme Court in *Ohio v. Robinette* are illustrative and merit close examination in addressing this inquiry.[10]

10. Although the consent issue arising in *Robinette* followed a conventional traffic stop, whereas Strickler's vehicle was already stopped when the officer confronted him, the United States Supreme Court has analogized the degree of intrusiveness involved in the usual traffic stop to the restraint involved in an investigative detention such as is presented here. *See, e.g., Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). This analogy obviously works in reverse; therefore, the *Robinette* opinions are pertinent.

In *State v. Robinette*, 73 Ohio St.3d 650, 653 N.E.2d 695 (1995)(*"Robinette I "*), the defendant, Robert D. Robinette ("Robinette"), was stopped for a speeding violation on an Ohio interstate highway by Montgomery County Deputy Sheriff Roger Newsome, whose patrol assignment involved drug interdiction. Deputy Newsome proceeded to: obtain Robinette's driver's license; perform a computer check of Robinette's driving record (which indicated no violations); ask Robinette to step out of his vehicle; direct Robinette to stand in a particular location; activate a mounted video camera; issue a verbal traffic warning; and return Robinette's license. *See id.* at 696. Deputy Newsome then asked: "One question before you get gone: are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" When Robinette said that he was not, the officer asked: "Would you mind if I search your car? Make sure there's nothing in there?" Robinette lent his consent to the search, which revealed a methamphetamine pill and a small amount of marijuana, and was arrested and charged with criminal offenses entailing possession of illegal drugs. Robinette sought to suppress the evidence obtained in the search; following denial of his motion, he pled no contest and was found guilty. The Ohio Court of Appeals, however, reversed the conviction, and the Ohio Supreme Court affirmed in a four-to-three decision. *See id.* at 699.

In its opinion, the Ohio Supreme Court confirmed the validity of the initial traffic stop, but identified the question most central to its disposition as "when the validity of that stop ceased." *See Robinette I,* 653 N.E.2d at 697. The court found that, when Deputy Newsome returned to Robinette's vehicle after performing a license check, every aspect of the speeding violation had been investigated and resolved, and all that remained was the return of Robinette's license and the issuance of a traffic warning. *See id.* The court determined that the deputy's additional actions—asking Robinette to depart his vehicle, activating the video camera, and the subsequent questioning related to possession of contraband—were unrelated to the purpose of the stop. *See id.* at 697–98. Since

the deputy was unable to identify articulable facts giving rise to a suspicion of some separate illegal activity justifying an extension of the detention, the court viewed the continued detention as illegal. *See id.* As it determined that Robinette's consent was obtained during the course of an illegal seizure, the court found that the State was required to establish that the consent was sufficiently removed from the corresponding taint. *See id.* at 698. Since there was no appreciable lapse of time between the detention and the request to search, the deputy sheriff prefaced his request with the phrase "before you get gone," and it discerned no circumstances which might have served to break or weaken the effect of the prior detention, the court deemed Robinette's consent to have resulted from the illegal detention. *See id.* (concluding that, "[g]iven the circumstances, Robinette felt that he had no choice but to comply").

More broadly, the Ohio Supreme Court expressed concern that, at the point in the encounter at which consent was sought from Robinette, an average citizen would not likely have appreciated that he was no longer subject to a valid detention. The court explained:

The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow.

The present case offers an example of the blurring between a legal detention and an attempt at consensual interaction. Even assuming that Newsome's detention of Robinette was legal through the time when Newsome handed back Robinette's driver's license, Newsome then said, "One question before you get gone: are you carrying any illegal contraband in your car?" Newsome tells Robinette that before he leaves Newsome wants to know whether Robinette is carrying any contraband. Newsome does not ask if he may ask a question, he simply asks it, implying that Robinette must

respond before he may leave. The interrogation then continues. Robinette is never told that he is free to go or that he may answer the question at his option.

Many people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him.

*Robinette I,* 653 N.E.2d at 698 (citations omitted). While acknowledging that consensual encounters are an important, constitutional investigative tool available to law enforcement, the court indicated that persons who are subjected to a detention prior to the request for consent are less likely to realize that they are not required to answer the questions posed by police. *See id.* at 699 ("[a] 'consensual encounter' immediately following a detention is likely to be imbued with the authoritative aura of detention"). Indeed, in the situation involving an initial detention, the Ohio court concluded that "[w]ithout a clear break from the detention, the succeeding encounter is not consensual at all." *Id.* For this reason, the court adopted a "bright-line," prophylactic rule mandating that, in the absence of reasonable suspicion of criminal activity separate and apart from the predicate traffic violation, once an initially valid traffic stop is concluded, a police officer must inform the motorist that the legal detention has ended before seeking consent to search. *See id.* (stating that "citizens stopped for traffic offenses [must] be clearly informed by the detaining officer when they are free to go after a valid detention, before an officer attempts to engage in a consensual interrogation"). The court indicated that such rule would serve to protect the rights of citizens from unwarranted "fishing expedition[s]" conducted by police officers. *See id.* at 699.

On review of the Ohio Supreme Court's decision, however, the United States Supreme Court reversed in an eight-to-one decision. *See Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417,

136 L.Ed.2d 347 (1996)("*Robinette II*").[11] The majority focused the inquiry upon the Ohio court's requirement that, upon completion of a traffic stop, a motorist be advised that he is free to go. *See id.* at 35, 117 S.Ct. at 419. Importantly, however, the Court also stated that

> [w]e believe that the issue as to the continuing legality of the detention is a "predicate to an intelligent resolution" of the question presented, and therefore "fairly included therein." The parties have briefed this issue, and we proceed to decide it.

*Id.* at 38, 117 S.Ct. at 420. Although the Court recognized that the Ohio deputy sheriff's stated reason for asking Robinette to exit his vehicle was to question him about possible contraband in his vehicle, the Court found the officer's subjective intentions irrelevant. *See id.* (citing *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) (finding that a police officer's subjective intent is irrelevant so long as there is objective justification for the police officer's actions)). The Court found that the officer was clearly justified in detaining Robinette for speeding, based on his observations, and additionally justified in asking Robinette to step out of the car, "subjective thoughts notwithstanding." *Robinette II*, 519 U.S. at 38, 117 S.Ct. at 421 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 333 n. 6, 54 L.Ed.2d 331 (1977)(holding that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures")).

The majority then turned to the question of the *per se* rule imposed by the Ohio court. At the outset, it emphasized that it had consistently eschewed bright-line rules in favor of assessment of the totality of the circumstances. *See Robinette II*, 519 U.S. at 39, 117 S.Ct. at 421. The Court then reviewed a series of Fourth Amendment cases in which it had applied a

---

11. As further discussed below, Justice Ginsburg filed a concurring opinion agreeing with the majority in all pertinent respects, and Justice Stevens authored a stand-alone dissenting opinion.

totality test, focusing most closely upon *Schneckloth,* 412 U.S. at 218, 93 S.Ct. at 2041, in which the Court rejected the argument that a consent to search could not be valid unless the defendant knew that he had a right to refuse the request. *See id.* at 227, 93 S.Ct. at 2048 (stating that "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent"). Analogizing to *Schneckloth,* the Court rejected Ohio's *per se* rule as unnecessary, as well as impractical. *See Robinette II,* 519 U.S. at 39, 117 S.Ct. at 421. The Court then remanded for further proceedings consistent with its opinion.

In her concurring opinion, Justice Ginsburg acknowledged the concerns that had motivated Ohio's imposition of a prophylactic rule.[12] Justice Ginsburg emphasized that the *Robinette* opinion does not prevent state courts from interpreting their own state constitutions so as to provide greater protection of individual rights than that mandated by the federal Constitution. *See Robinette II,* 519 U.S. at 42, 117 S.Ct. at 422–23 (Ginsburg, J., concurring)(stating that "[t]oday's opinion reversing the decision of the Ohio Supreme Court does not pass judgment on the wisdom of the first-tell-then-ask rule[;] [t]his Court's opinion simply clarifies that the Ohio Supreme Court's instruction to police officers in Ohio is not, under this Court's controlling jurisprudence, the command of the Federal Constitution").

In his dissenting opinion, Justice Stevens agreed with the majority that a *per se* rule was not mandated by the Fourth

---

**12.** Justice Ginsburg stated:

> From their unique vantage point, Ohio's courts observed that traffic stops in the State were regularly giving way to contraband searches, characterized as consensual, even when officers had no reason to suspect illegal activity. One Ohio appellate court noted: "Hundreds, and perhaps thousands of Ohio citizens are being routinely delayed in their travels and asked to relinquish to uniformed police officers their right to privacy in their automobiles and luggage...."

*Robinette II,* 519 U.S. at 40–41, 117 S.Ct. at 422 (Ginsburg, J., concurring) (citations omitted). Justice Ginsburg also acknowledged the Ohio court's concern that most citizens would not feel free to depart while an officer continues to address them. *See id.*

Amendment, but indicated that he would have affirmed the Ohio court's disposition based upon the conclusion that Robinette's consent to the search of his vehicle was the product of an unlawful detention. *See Robinette II*, 519 U.S. at 45, 117 S.Ct. at 424 (Stevens, J., dissenting). Justice Stevens began his analysis by reiterating the objective, *Mendenhall/Royer* "free-to-leave" test for determining whether a seizure has been effected. *See Robinette II*, 519 U.S. at 46, 117 S.Ct. at 424–25 (Stevens, J., dissenting). He indicated that a reasonable person in Robinette's position would not have felt free to leave as the officer sought consent to search, based upon the following facts: the officer's initial question after handing Robinette back his license sought a response "before you get gone"; Robinette was directed outside his vehicle and before a video recorder; and Robinette had not been informed that the purpose of the initial detention had been achieved and he was free to leave. *See Robinette II*, 519 U.S. at 33, 117 S.Ct. at 425 (Stevens, J., dissenting). More broadly, Justice Stevens agreed with the Ohio court's conclusion that most citizens subject to continuing police interrogation following a detention would continue to believe that they validly remain in the officer's custody. *See id.* at 33 & n. 4, 117 S.Ct. at 425 & n. 4 (citing *Berkemer*, 468 U.S. at 436, 104 S.Ct. at 3148 (stating that "[c]ertainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so")). Justice Stevens also indicated his belief that many motorists have an interest in preserving their privacy and would not likely consent to additional roadside delay if they fully appreciated their rights. *See Robinette II*, 519 U.S. at 47–48, 117 S.Ct. at 425 (Stevens, J., dissenting). He noted that the *Robinette* record indicated that the officer had successfully obtained consent to search 786 times in a single year, which he deemed, in and of itself, to indicate that "motorists generally respond in a manner that is contrary to their self-interest." *Id.*

Based upon the facts, and what he perceived as the objective reality of the inherently coercive nature of traffic stops, Justice Stevens concluded that the Ohio court was correct in

its determination that Robinette was the subject of a continuing detention at the time he consented to the search of his car. *See Robinette II,* 519 U.S. at 50–51, 117 S.Ct. at 427 (Stevens, J., dissenting). Since he found no reasonable suspicion to support the continued investigative detention, Justice Stevens concluded that it was unlawful. *See id.* He deemed this conclusion to be independent of the Ohio court's imposition of a bright-line rule and therefore found no reason to disturb it. *See id.* at 45–46, 117 S.Ct. at 424.

The majority opinion in *Robinette II* has been criticized for failing to expressly resolve, or offering an unduly truncated resolution of, the question of the existence and lawfulness of a detention at the time consent was obtained under such circumstances.[13] Nevertheless, as such question was framed as essential to the disposition, *see Robinette II,* 519 U.S. at 38, 117 S.Ct. at 420 ("the issue as to the continuing legality of the detention is a 'predicate to an intelligent resolution' of the question presented"), and the Court expressly indicated that it was undertaking to answer it, *id.* ("we proceed to decide [the legality question]"), it cannot be fairly said that the Court did not, at least in some sense and to some degree, address the seizure inquiry. In the most general sense, it is clear that the Court perceived no federal constitutional impediment to the consent protocol immediately following a typical traffic stop

---

**13.** *See, e.g.,* Chris K. Visser, *Without a Warrant, Probable Cause, or Reasonable Suspicion: Is There Any Meaning to the Fourth Amendment While Driving a Car?,* 35 Hous L.Rev 1683, 1718 (1999) (contending that the *Robinette II* majority failed to address the question whether Robinette was "seized" when the officer asked for consent to search); George M. Dery III, *"When Will This Traffic Stop End?": The United States Supreme Court's Dodge of Every Detained Motorist's Central Concern—Ohio v. Robinette,* 25 Fla. St. U.L.Rev. 519, 551 (1998) (stating that the Court "dodged," "glossed over" and "skipped over" the issue); R. Maahs, *Reason to Believe: When Does Detention End and a Consensual Encounter Begin? An Analysis of Ohio v. Robinette,* 23 Ohio N.U. L.Rev. 309, 337 (1996) (stating that the Court "brushed aside" the issue); *cf.* Marianna Brown Bettman, *Identical Constitutional Language: What Is a State Court To Do? The Ohio Case of State v. Robinette,* 32 Akron L.Rev. 657, 661 (1999) (stating that the Court "rejected" the Ohio Supreme Court's analysis of the issue); Christo Lassiter, *Eliminating Consent from the Lexicon of Traffic Stop Interrogations,* 27 Cap. U.L.Rev. 79, 89 (1998) (same).

which would arise from the mere fact of a prior, lawful detention, or of subsequent questioning unrelated to the purpose of such detention.[14] *See generally* Dery, *"When Will This Traffic Stop End?"*, 25 Fla. St. U.L.Rev. at 554 (noting that, "[b]y going directly to the consent issue, especially after mentioning the importance of the continued validity of the detention, *Robinette* signaled in deeds, more powerfully than in words, that the detention here lacked any constitutional significance").

In the present case, the suppression court did not have the benefit of *Robinette II* (as its opinion was issued in the preceding year), and its evaluation clashes with *Robinette II* in several regards. First, while the suppression court legitimately expressed concern regarding the effect of the prior lawful detention upon Strickler's consent, *see infra* (discussing the appropriateness of such consideration in the totality assessment), it essentially elevated this concern to a *per se* rule to the effect that a law enforcement officer cannot proceed to request consent to search following a detention,[15] rather than balancing it against other pertinent factors. Read against *Robinette II*, such an approach is unsustainable under Fourth Amendment jurisprudence. Correspondingly, the suppression

14. Indeed, given the timing of Deputy Newsome's return of Robinette's driver's documentation (immediately after he had completed a computer check, directed Robinette to step out of his vehicle and stand in a particular location, and activated a video camera), the circumstances presented in *Robinette* would appear to have involved a greater show of authority (or at least one in closer proximity to the subsequent request for consent) than in a typical stop.

15. In addition to its commentary at the suppression hearing, quoted *supra*, the suppression court's analysis in its opinion proceeds as follows:

> In the instant case it is clear that [the arresting officer] detained Strickler and his companion in order to ascertain what they were doing. That detention was proper. After he determined that everything was in order, and immediately after handing Strickler's papers back to him, [the officer] asked if he could search the car. That request illegally prolonged the detention. At that point, Strickler was detained for no reason, based on no reasonable suspicion or probable cause. Because the detention at that point was illegal, the consent, if any, was tainted and therefore invalid.

Such analysis would not appear to allow for the possibility that a mere encounter might ever occur following a detention.

court's factual findings and legal conclusions do not reflect an evaluation of the entire range of salient factors as required by *Robinette II* and the precedent upon which it relies. For example, the suppression court's opinion did not discuss the arresting officer's uncontradicted testimony that he advised Strickler that he was not required to consent to the requested search,[16] nor did it expressly consider the absence of any excessive show of authority on the part of the officer.[17]

Nonetheless, one reasonable interpretation of the language of *Robinette II* lends some currency to the suppression court's ultimate disposition. Since *Robinette II* purports to address the "continuing legality of the detention" as a predicate inquiry, the decision could be construed as deeming all circumstances connected with the overall encounter between Deputy Newsome and Robinette to reflect a single, albeit constitutionally-permissible detention. Our jurisprudence under Article I, Section 8 of the Pennsylvania Constitution, however, would not sustain a consent search conducted in the context of, but which is wholly unrelated in its scope to, an ongoing detention, since there can be no constitutionally-valid detention independently or following a traffic or similar stop absent reasonable suspicion, *see, e.g., Commonwealth v. Melendez,* 544 Pa. 323, 329, 676 A.2d 226, 229 (1996), and the scope of a detention is circumscribed by the reasons that justify it.[18] Therefore, if *Robinette II* is construed as such,

**16.** Although it has been stated that such admonitions, while pertinent to the issue of voluntariness, are not relevant to the underlying issue of whether there has been a detention in the first instance, *see, e.g.,* R. Stack, *Airport Drug Searches: Giving Content to the Concept of Free and Voluntary Consent,* 77 Va. L.Rev. 183, 193 (Feb.1991), as discussed *infra,* we disagree with such an assertion.

**17.** The trial court's reliance upon *Lopez,* 415 Pa.Super. at 252, 609 A.2d at 177, is also not helpful, as the circumstances in *Lopez* were quite different from those presented here. For example, in *Lopez,* the request for consent to search occurred prior to the return of the citizen-subject's driver's license and vehicle registration. *See Lopez,* 415 Pa.Super. at 256, 609 A.2d at 179.

**18.** *See Commonwealth v. Zhahir,* 561 Pa. 545, 559, 751 A.2d 1153, 1160 (2000)(citing *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968)). *See generally Royer,* 460 U.S. at 500, 103 S.Ct. at 1325–26; *Berkemer,* 468 U.S. at 439, 104 S.Ct. at 3150; *United States*

there is a sound basis for considering its rejection on state constitutional grounds.

Alternatively, however, the seizure analysis contained in *Robinette II* can be read directly against the *Robinette I* court's holding that the lawful detention ended immediately after Deputy Newsome returned to Robinette's vehicle after completing the license check. *See Robinette I,* 653 N.E.2d at 697. The United States Supreme Court obviously disagreed with and discredited such assessment, citing, as it did, to *Mimms* to support the conclusion that Robinette was still subject to lawful detention at the time that he was ordered out of his vehicle and directed to stand in a particular location. *See Robinette II,* 519 U.S. at 38, 117 S.Ct. at 421. Since this represents the full extent of the Court's express seizure analysis, it would also be fair to construe *Robinette II* not as eliminating the possibility of an analytical division of the overall police/citizen interaction into two separate, successive encounters, but merely as moving the endpoint of the initial lawful detention to the later point when Deputy Newsome administered traffic warnings and returned Robinette's driver's documentation.[19] Reading *Robinette II* in this manner aids in squaring the decision with our own jurisprudence, as well as the United States Supreme Court's prior decisional law.[20] *See generally People v. Brownlee,* 186 Ill.2d 501, 239

*v. Jones,* 44 F.3d 860, 872 (10 th Cir.1995)("[s]ubsequent or concurrent detentions for questioning are justified only when the officer has 'reasonable suspicion' of illegal transactions in drugs or any other serious crime" (citations omitted)); *Commonwealth v. Pless,* 451 Pa.Super. 209, 212, 679 A.2d 232, 233 (1996).

**19.** This shifting of the endpoint for the traffic stop obviously is essential to leaving open the possibility of a subsequent consensual encounter. If, as the Ohio court held, Deputy Newsome's dictation of Robinette's movements were to be seen as occurring after the conclusion of the traffic stop, the possibility of a succeeding mere encounter would essentially be foreclosed absent a clear break in the chain of events. *See generally Commonwealth v. Freeman,* 563 Pa. 82, 90, 757 A.2d 903, 907 (2000) (noting that a request that an individual move in some manner has been regarded as persuasive evidence that a seizure has occurred (citing *Ferris v. State,* 355 Md. 356, 735 A.2d 491, 505 (1999))).

**20.** As noted, *Terry v. Ohio* and its progeny strongly suggest that a traffic stop (viewed as the equivalent of a *Terry* stop) is not an appropriate

Ill.Dec. 25, 713 N.E.2d 556, 563 (1999)(stating that "[c]ertainly *Robinette* does not stand for the proposition that, following the conclusion of a lawful traffic stop, officers may detain a vehicle without reasonable suspicion of any illegal activity and for any amount of time, so long as they ultimately request and obtain permission to search the car").

This is essentially how the Ohio Supreme Court treated *Robinette II* on remand, as it did not view Robinette's encounter with Deputy Newsome as a single, continuous lawful detention. Rather, even accepting the United States Supreme Court's decision to (at a minimum) shift the endpoint of the traffic stop to the moment when Robinette's license was returned and the traffic warning administered, the Ohio court found that Robinette had subsequently been the subject of a separate, *unlawful* detention. *See State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762, 771 (1997)("*Robinette III* "). In relation to Deputy Newsome's request for consent to search,[21] the court revisited the circumstances of the encounter, as follows:

> Newsome's words did not give Robinette any indication that he was free to go, but rather implied just the opposite—that Robinette was not free to go until he answered Newsome's

vehicle within which to make inquiries about potential unlawful conduct unrelated to the stop not supported by reasonable suspicion. *See Terry*, 392 U.S. at 19–20, 88 S.Ct. at 1878–79. Notably, the *Robinette* decisions and the associated commentary are essentially universal in concluding that Deputy Newsome's only valid ground for stopping Robinette related to enforcement of the laws of the highways, and no reasonable suspicion that Robinette possessed contraband was present.

**21.** Notably, the Ohio court distinguished this request for consent to search from Deputy Newsome's preceding inquiry as to whether Robinette possessed any contraband. Although it found no reasonable suspicion to support a continued detention to make the latter inquiry, the Ohio court concluded that curtailment of illegal drug trafficking was an interest of sufficient public importance to, in and of itself, justify the detention of individuals for the limited purpose of making such an inquiry. *See Robinette III*, 685 N.E.2d at 768. This Court, however, has eschewed such logic, *see Commonwealth v. Rodriquez*, 532 Pa. 62, 73, 614 A.2d 1378, 1383 (1992), and this appeal was not allowed or argued toward the end of reconsidering this established position. *See generally Matos*, 543 Pa. at 461, 672 A.2d at 775–76; *Melendez*, 544 Pa. at 329, 676 A.2d at 229 ("[n]o person may be stopped for 'investigation' in the absence of an articulable reason to suspect criminal activity").

additional questions. The timing of Newsome's immediate transition from giving Robinette the warning for speeding into questioning regarding contraband and the request to search is troubling....

\* \* \*

When these factors are combined with a police officer's superior position of authority, any reasonable person would have felt compelled to submit to the officer's questioning. While Newsome's questioning was not expressly coercive, the circumstances surrounding the request to search made the questions impliedly coercive.... From the totality of the circumstances, it appears that Robinette merely submitted to "a claim of lawful authority" rather than consenting as a voluntary act of free will.

*Robinette III*, 685 N.E.2d at 770–71. Given this conclusion, the court was able to hold that Robinette's consent was involuntary and suppression warranted, *Robinette II* notwithstanding. *See id.* at 771–72.

Upon review, we also endorse an interpretation of *Robinette II* which allows for the possibility of a mere encounter following a traffic stop or similar detention and proceed to the assessment of the totality of the circumstances.

Various courts and commentators have frequently set forth non-exclusive lists of factors deemed relevant to the determination of whether a seizure has been effected. For example, the presence or absence of police excesses has played a particularly significant role in United States Supreme Court jurisprudence.[22] Physical contact or police direction of a citizen-subject's movements has also been regarded as a central consideration. *See, e.g., Ferris,* 735 A.2d at 505 (citing

**22.** *See, e.g., Bostick,* 501 U.S. at 432, 437, 111 S.Ct. at 2385, 2388 (noting that there was no evidence suggesting that the officer's "gun was ever removed from its pouch, pointed at Bostick, or otherwise used in a threatening manner"); *Chesternut,* 486 U.S. at 574–75, 108 S.Ct. at 1980 (finding significant the lack of sirens and flashers, a command to halt, the display of weapons, and the operation of the police car in an "aggressive manner" as relevant to the seizure issue). *See generally* 4 LaFave, Search and Seizure 8.2(b), at 644–49.

*United States v. Gonzales*, 842 F.2d 748, 752 (5th Cir.1988), *overruled on other grounds*, *United States v. Hurtado*, 905 F.2d 74 (5th Cir.1990)). This Court has also stressed more subtle factors, for example,

> the demeanor of the police officer, the location of the confrontation, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements.

*Jones*, 474 Pa. at 371–74, 378 A.2d at 839–41. *See generally Schneckloth*, 412 U.S. at 229, 93 S.Ct. at 2049.

■ Additionally, in the context of a police/citizen interaction that follows a lawful detention, we find that the existence and character of the initial investigative detention merits separate consideration as a relevant factor. Significantly, in *Jones*, 474 Pa. at 364, 378 A.2d at 835, this Court recognized that there is some coercive aspect even in non-detentive interactions between law enforcement officers and citizens. *See id.* at 371–72, 378 A.2d at 839 (stating that "a police officer in uniform must be considered as showing authority and thus exercising some force simply because he is in uniform, a symbol of authority, when he approaches a citizen and addresses questions to him"). *Jones*, however, reflects the holding of *Terry v. Ohio* to the effect that the quantum of force resulting from the mere fact of the police/citizen encounter, in and of itself, is not sufficient to support the finding of a detention. *See id.* This element of coercion is obviously enhanced when police actually detain a citizen, albeit lawfully, for some period of time, by means of a traffic or similar stop. Moreover, as noted by Justices Stevens and Ginsburg, the *Robinette I* court, the *Robinette III* court, other courts and numerous commentators, this coercive effect is not necessarily entirely dispelled merely because a law enforcement officer returns the citizen's driver's documentation or otherwise accomplishes the purpose of the detention. While, analogous to *Jones*, *Robinette II* strongly suggests (if it does not hold) that the mere existence of such an effect is not, in and of itself, a sufficient basis to support the finding of a seizure, *see Robinette II*, 519 U.S. at 39–40, 117 S.Ct. at 421, the degree of

coercion applied in the prior encounter will affect the weight to be assigned to this factor in the overall totality assessment. Centrally, we are unable to discount the fact that there remains at work some pertinent psychological dynamic based upon the relative positions of authority as between the officer and a citizen-subject, and an immediately-preceding exercise of the officer's authority, and conclude that courts would be ill advised to ignore such dynamic in the totality assessment. *See generally Ferris*, 735 A.2d at 502 (noting that the "pre-existing seizure enhanced the coercive nature of the situation and the efficacy of the other factors in pointing toward the restriction of [the detainee's] liberty").

■ We also agree with *Robinette I* that the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless, *see Robinette I*, 653 N.E.2d at 698, thus suggesting to a citizen that his movements may remain subject to police restraint, is a pertinent factor. In this regard, many courts and commentators have expressed sentiments similar to that expressed by the United States Supreme Court in *Berkemer*, 468 U.S. at 436, 104 S.Ct. at 3148: "few motorists would feel free ... to leave the scene of a traffic stop without being told they might do so." [23] While recognizing the Supreme Court's holding in *Robinette* that the admonition to a motorist that he is free to leave is not a constitutional imperative, the presence or absence of such a clear, identified endpoint to the lawful seizure remains a significant, salient factor in the totality assessment.

**23.** *See, e.g., Ferris*, 735 A.2d at 503 (noting that "[t]he moment at which a traffic stop concludes is often a difficult legal question, not readily discernible by a layperson[;] [i]t is not sound to categorically impute to all drivers the constructive knowledge as to the precise moment at which, objectively, an initially lawful traffic stop terminates, i.e., the time at which the driver may depart"); *People v. Interest of H.J.*, 931 P.2d 1177, 1181 (Colo.1997); 4 LaFave, Search and Seizure § 9.3(a), at 112 ("[g]iven the fact that [the driver] quite clearly had been seized when his car was pulled over, the return of [his] credentials hardly manifests a change in status when it was immediately followed by interrogation concerning other criminal activity").

■ As the United States Supreme Court has emphasized, rules fashioned by courts to implement constitutional precepts that regulate police activities should be expressed in terms that are readily understandable and applicable in daily encounters. *See New York v. Belton,* 453 U.S. 454, 458, 101 S.Ct. 2860, 2863, 69 L.Ed.2d 768 (1981). Reciprocally, law enforcement officers can tailor their conduct in ways that will assist trial and appellate courts in the performance of their essential functions, with the corollary benefit of enhancing consistency and predictability of results in judicial proceedings. Toward both ends, we reiterate that, in evaluating a consensual encounter that follows a traffic or similar stop, a central consideration will be whether the objective circumstances would demonstrate to a reasonable citizen that he is no longer subject to domination by police. The presence of an express admonition to the effect that the citizen-subject is free to depart is a potent, objective factor that favors such conclusion.[24] As this Court stated in *Jones,* "while not required to do so, an officer who wishes to approach a citizen to investigate crime but who does not wish to 'stop' that citizen, can best predict the consequences of his behavior by advising the citizen he is free to leave without answering questions." *Jones,* 474 Pa. at 373 n. 7, 378 A.2d at 840 n. 7. This observation is even more appropriate in the context of a post-detention interaction. *See generally Ferris,* 735 A.2d at 504 (citing cases for the proposition that "the failure by law enforcement to inform a citizen that he or she is free to terminate the encounter is a significant factor suggesting a continued seizure under the Fourth Amendment"); *Robinette III,* 685 N.E.2d at 771 n. 6 ("[i]f police wish to pursue a policy of searching vehicles without probable cause or reasonably articulable facts, the police should ensure that the detainee knows that he or she is free to refuse consent despite the

24. The conferral of the "free-to-go" advice is, itself, not a reason to forego a totality assessment, as, for example, the presence of a drawn weapon or the absence of any available means of egress would be circumstances remaining after the ostensible conclusion of a traffic stop which would color any such advice.

officer's request to search or risk that any fruits of any such search might be suppressed").[25]

■ In the present case, we first note the existence of the prior, lawful detention as a factor engrafting a degree of coercion upon the encounter. Also enhancing the coercive aspects to a degree are the temporal and geographic elements of the interaction. As Strickler recounts, "[i]t was late at night, [he] was not from the area, and there were two police officers with marked patrol cars with flashing lights standing three to four feet away from [him]." *See generally Ferris*, 735 A.2d at 505 (indicating that such factors would have been unsettling to a reasonable person in the defendant's position).[26] Looking more closely at the character of the prior seizure, however, it is significant that the officer's conduct appears to have been quite restrained throughout the period of the detention; indeed, the level of coercion that was applied was less than that associated with an ordinary traffic stop. In the first instance, it was not necessary to stop Strickler at all, since he was already out of his vehicle. Although the officer

**25.** Interestingly, the *Robinette III* court also quoted an *amicus curiae* brief from Americans for Effective Law Enforcement as follows:

"Such a warning may be good police practice, and indeed amicus knows that many law enforcement agencies among our constituents have routinely incorporated a warning into their Fourth Amendment consent forms that they use in the field, but [it] is precisely that—a practice and not a constitutional imperative. An officer who includes such a warning in his request for consent undoubtedly presents a stronger case for a finding of voluntariness in a suppression hearing, and we would not suggest that such agencies and officers do otherwise. We know, too, that instructors in many police training programs of leading universities and management institutes routinely recommend such warnings as a sound practice, likely to bolster the voluntariness of a consent to search."

*Robinette III*, 685 N.E.2d at 771 n. 6. *See generally* Dery, *"When Will This Traffic Stop End?"*, 25 FLA. ST. U.L.REV. at 564 (asserting that a free-to-go admonition "based as it is on overt communication, clarifies the encounter for the individual, thus allowing officers to maintain better control").

**26.** Strickler's suggestion that flashing lights from the nearby police cruiser added to the unsettling effect is not supported in the record. Indeed, to the contrary, the arresting officer testified to his belief that the emergency lights were not activated, or, if they were, only the back-up lights were illuminated, shining only to the rear of the vehicle.

asked Strickler to come over to him, this directive was issued in the initial stages of the detention, *cf. Freeman,* 563 Pa. at 89, 757 A.2d at 906, and entailed a lesser degree of intrusion than that involved in requiring a driver to step from his vehicle during a traffic stop. As the Superior Court stressed, there are a number of other factors involving a demonstrative exercise of police authority that are absent from the present case. There is no evidence of a show of weapons, unusual commands, aggressive behavior or any use of language or tone by the officer that was not commensurate with the circumstances. Although a second officer was present for part of the encounter, the evidence suggests that he was not an active participant. Thus, overall, the arresting officer operated well within the boundaries of a typical traffic stop/investigative detention.

Further, although the officer did not expressly advise Strickler and his companion that they were free to leave, his actions at least suggested as much, in that he returned Strickler's driver's documentation, thanked him for his cooperation, and turned away prior to reinitiating the interaction and ultimately requesting consent to search. *See generally United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir.1993)(referencing the "clear line historically drawn between police-citizen encounters which occur before and after an officer returns a . . . driver's documentation"). Nevertheless, the absence of an express endpoint to the detention in the form of an admonition by the officer that Strickler was free to leave is an area of concern that carries forward in our assessment of the remaining relevant circumstances.

The officer, however, did nothing following the actual endpoint of the lawful detention that would independently suggest that his subsequent requests were to be viewed as directives: the "excesses" factors emphasized in United States Supreme Court jurisprudence remained absent; the officer did not touch Strickler or direct his movements; there is no evidence of any use of coercive language or tone by the officer. We also deem significant the arresting officer's admonition to Strickler that he was not required to consent to the search.

Regarding such advice, in *Mendenhall,* the United States Supreme Court stated as follows:

> [I]t is especially significant that [the defendant] was twice expressly told that she was free to decline to consent to the search, and only thereafter explicitly consented to it. Although the Constitution does not require proof of knowledge of a right to refuse as the sine qua non of an effective consent to a search, such knowledge was highly relevant to the determination that there had been consent. And, perhaps more important for present purposes, *the fact that the officers themselves informed [the defendant] that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive.*

*Mendenhall,* 446 U.S. at 558–59, 100 S.Ct. at 1879 (citation omitted; emphasis added); *see also Bostick,* 501 U.S. at 432, 111 S.Ct. at 2385 (describing as "particularly worth noting" the fact that police specifically advised the defendant that he had the right to refuse consent). Here, the admonition counterweighs the officer's failure to expressly advise Strickler that he was free to leave.

In summary, the Upper Allen Township officer conducted an investigative detention of a less intrusive nature than is permitted in connection with an ordinary traffic stop. Although the officer did not make the endpoint to the lawful detention an express one, there was an endpoint nonetheless; moreover, the officer confined his subsequent conduct and conformed his requests in a manner consistent with a consensual encounter and expressly advised Strickler of his right to refuse consent. Weighing the above factors in light of *Robinette II,* we conclude that the request to search did not rise to a second or subsequent seizure under the Fourth Amendment, and, accordingly, proceed to a voluntariness assessment.[27]

27. As noted, since we have determined that Strickler was not seized at the time he granted his consent to the search of his vehicle, no Fourth Amendment interests are implicated in connection with the officer's requests and questioning. However, since a search was performed, and the Fourth Amendment also protects against unreasonable searches, a separate voluntariness assessment remains appropriate.

 In connection with such inquiry, the Common-
wealth bears the burden of establishing that a consent is the
product of an essentially free and unconstrained choice—not
the result of duress or coercion, express or implied, or a will
overborne—under the totality of the circumstances. *See gen-
erally Robinette II,* 519 U.S. at 40, 117 S.Ct. at 421. As noted,
while knowledge of the right to refuse to consent to the search
is a factor to be taken into account, the Commonwealth is not
required to demonstrate such knowledge as a prerequisite to
establishing a voluntary consent. *See Schneckloth,* 412 U.S. at
227–28, 93 S.Ct. at 2041; *Cleckley,* 558 Pa. at 527, 738 A.2d at
433. Additionally, although the inquiry is an objective one,
the maturity, sophistication and mental or emotional state of
the defendant (including age, intelligence and capacity to
exercise free will), are to be taken into account. *See generally
United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64
L.Ed.2d 497 (1980); *United States v. Watson,* 423 U.S. 411, 96
S.Ct. 820, 46 L.Ed.2d 598 (1976). *See generally* 3 LaFave,
Search and Seizure § 8.2(d), at 666–73. The Supreme Court
has also rejected the argument that a defendant's consent is
necessarily involuntary where it is given at a time when the
defendant knows the search will produce evidence of a crime.
*See Bostick,* 501 U.S. at 438, 111 S.Ct. at 2388 (finding that the
reasonable person test presupposes an innocent person).

 Since both the tests for voluntariness and for a sei-
zure centrally entail an examination of the objective circum-
stances surrounding the police/citizen encounter to determine
whether there was a show of authority that would impact upon
a reasonable citizen-subject's perspective, there is a substan-
tial, necessary overlap in the analyses. The reasons support-
ing the conclusion that Strickler was not seized at the time
that he lent his consent to the vehicle search therefore also
militate strongly in favor of a determination that his consent
was voluntary. Nothing in the record supports a determina-
tion that Strickler's individual maturity, sophistication or men-
tal state should have any bearing in this regard. Moreover,
the arresting officer's admonition that Strickler was free to

refuse the request for consent is directly pertinent to establish the voluntariness of Strickler's consent.

Thus, the Commonwealth's unrebutted evidence was sufficient to satisfy its burden of demonstrating both that Strickler was not subject to a seizure for purposes of the Fourth Amendment at the time his consent was sought and given, and that his consent was voluntary.

Finally, in addition to relying upon the Fourth Amendment, Strickler makes passing references to Article I, Section 8 of the Pennsylvania Constitution. Nonetheless, he offers nothing that would distinguish the pertinent protections available under the Pennsylvania Constitution from those available under the Fourth Amendment. We therefore decline in this case to undertake a full review of the factors identified in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991). Significantly, this Court's recent decision in *Cleckley* lays the groundwork for alignment of Pennsylvania law with Fourth Amendment jurisprudence. *See Cleckley*, 558 Pa. at 528, 738 A.2d at 433 (endorsing the *Schneckloth* test for voluntariness in the context of a request for consent to search made during the course of a mere encounter). *See generally Robinette II*, 519 U.S. at 39, 117 S.Ct. at 421 (relying upon *Schneckloth* to support the conclusion that the totality-of-the-circumstances approach was also appropriate to the determination of whether and to what extent a seizure has been effected). Therefore, for present purposes, concerns such as those identified by the Ohio Supreme Court in *Robinette*, as that court ultimately concluded, are adequately addressed within the totality assessment.[28]

The order of the Superior Court is affirmed.

**28.** At oral argument, counsel advancing the lead issue in this and several consolidated cases requested that this Court take judicial notice that police employ tactics such as consent searches on a selective, discriminatory basis against members of protected classes, primarily on Pennsylvania interstate highways used as conduits by traffickers of illegal drugs. Preliminarily, such arguments would appear to be better framed under the Equal Protection or Due Process Clauses, or addressed to our supervisory powers, than asserted as a basis for a modified construct for determining whether a seizure has occurred in

Justice ZAPPALA concurs in the result.

Justice NIGRO files a dissenting opinion.

NIGRO, Justice, dissenting.

I respectfully dissent, as I believe that Strickler was being subjected to an illegal detention when he gave the police consent to search his vehicle.

In the instant case, there is no question that Strickler was subjected to an investigative detention when the officer asked for his license and registration and proceeded to run a check on them. When the officer returned Strickler's license and registration and issued him a warning, he no longer had a reasonable suspicion that criminal activity was afoot (i.e., a justification to continue the stop). Nevertheless, the officer proceeded to question Strickler, asking him whether he had anything illegal in his vehicle, and ultimately obtained consent to search the vehicle. In my view, any reasonable individual in Strickler's position would not have felt free to go when the officer turned around and asked whether he had anything illegal in his vehicle. Thus, I believe that Strickler was indeed subjected to an illegal detention at the time that his consent was obtained.

The majority, however, finds that the officer's investigative detention of Strickler ended at some point, resulting in a mere consensual encounter between the officer and Strickler when Strickler gave his consent to search his vehicle. I disagree. Simply put, I believe that it is unrealistic for all practical purposes to assume that a citizen who is detained by the police at night on the side of a road would reasonably feel free to go

the first instance, or the voluntariness of consent. As important, courts are ill-suited to render pronouncements concerning such claims absent a full evidentiary record. While counsel's assertions, if proven, would certainly merit this Court's attention, as counsel acknowledged, the assertion of such discriminatory conduct finds no support in the record of any of the consolidated cases. *Cf. generally State v. Soto,* 324 N.J.Super. 66, 734 A.2d 350, 360–61 (1996)(holding that unrebutted statistical evidence of disproportionate traffic stops involving African–American drivers established selective enforcement violating the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution).

on his way while the police continue to ask him questions about possible criminal activity, especially in an instance, such as that presented in the instant case, where the officer conducting the stop does not expressly inform the detainee that he is free to go.[1] *See Ohio v. Robinette*, 519 U.S. 33, 47, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (Stevens, J., dissenting) (noting his approval of the Ohio Supreme Court's practical observation that most reasonable people would not feel free to walk away while a police officer who has detained them for one reason or another continues to question them). Thus, I respectfully dissent.

---

1. With this in mind, I would note my agreement with the proposition set forth by the majority that an express admonition on the part of a detaining officer to the subject of a stop that he is free to go constitutes a potent, objective factor supporting a conclusion that the investigative detention has ceased.