J-S34025-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| SAMUEL PATRICK KULKA | |
| Appellant | No. 1730 WDA 2017 |

Appeal from the Judgment of Sentence imposed October 5, 2017
In the Court of Common Pleas of Crawford County
Criminal Division at No: CP-20-CR-0000047-2016

BEFORE:  BOWES, STABILE, AND STRASSBURGER,* JJ.

MEMORANDUM BY STABILE, J.:                    **FILED AUGUST 23, 2018**

Appellant, Samuel Patrick Kulka, appeals from the judgment of sentence imposed on October 5, 2017 in the Court of Common Pleas of Crawford County.  Relying on **Birchfield v. North Dakota**, 136 S.Ct. 2160 (2016),[1] Appellant argues that the trial court erred in not suppressing the results of his warrantless blood test.  We disagree.  Accordingly, we affirm.

The underlying facts are not in dispute.  As developed at the suppression hearing,

> [on] October 31, 2016, at approximately 3:38 a.m., Conneaut Lake Regional Police Officer Clay M. Doolittle was on routine patrol in a marked vehicle cruiser in full uniform.  At that time, he was

---

* Retired Senior Judge assigned to the Superior Court.

[1] **Birchfield** held that the Fourth Amendment to the United States Constitution does not permit warrantless blood tests incident to arrests for drunk driving and that a state may not criminalize a motorist's refusal to comply with a demand to submit to blood testing.  **Birchfield**, 136 S. Ct. at 2185-86.

parked in Sadsbury Township, Crawford County, Pennsylvania, in a funeral home parking lot near the intersection of Route 322 and Route 18.

While observing traffic, a vehicle passed him in the right-hand lane. A larger GMC truck then passed the first vehicle in the left lane. This caught the [o]fficer's attention, so he followed the GMC truck, which was [Appellant]'s vehicle. The [o]fficer pulled the truck over when [Appellant] turned left off of Water Street onto Fourth Street without a turn signal.

When the [o]fficer exited his vehicle and approached [Appellant]'s truck, [Appellant]'s truck was still running but he had rolled the driver's door window down. Upon approaching the truck, the [o]fficer smelled an extremely strong alcoholic beverage odor.

The [o]fficer indicated that [Appellant] was in the driver's seat and was exceptionally excited when he approached, repeatedly saying please don't "taze me and don't shoot me." He felt that [Appellant]'s actions were somewhat exaggerated. Additionally, the [o]fficer noted that [Appellant] spoke with slurred words and had a thick tongue with regard to his speech.

Based on how Appellant was acting, the [o]fficer asked [Appellant] if he had a weapon in the truck. [Appellant] indicated that he did have a firearm in the glove box. The [o]fficer then asked if he could remove [Appellant]'s weapon from the glove box, and [Appellant] consented. The [o]fficer asked [Appellant] to get out of the truck so that he could remove the weapon. However, [Appellant] indicated to him that the door was stuck, so the [o]fficer directed [Appellant] to keep his hands on the steering wheel while he went around to the glove compartment to remove the firearm.

[Appellant] complied, and the [o]fficer removed, unloaded, and took control of the firearm. Thereafter, [Appellant] was able to push his door open and exit the truck. The [o]fficer then determined that the strong odor of an alcoholic beverage was coming from [Appellant]'s person.

The [o]fficer asked [Appellant] to perform an HGN test – which he failed; a walk and turn test – which he failed; and a one[-]leg stand test – which he failed. Additionally, the [o]fficer administered a PBT test; and when he did, [Appellant] inquired as

to whether that would be used for an official determination of his blood alcohol [content]. The [o]fficer indicated to him that it was just a preliminary reading. During the discussion[,] [Appellant] said that he had consumed ten alcoholic beverages. Prior to that, [Appellant] had indicated that he had seven drinks and then chugged four drinks before driving because he had gotten into an argument with his significant other. [Appellant] also indicated that he did not drink often.

The [o]fficer concluded that [Appellant] was not able to safely drive the vehicle and placed him under arrest. Typically[,] at this point, they would have gone to the Conneaut Lake Regional Police facility for a breath test, but that equipment was being serviced that weekend. Thus, the [o]fficer asked [Appellant] if he would consent to a blood test, and [Appellant] said he would. [Appellant] was taken to the hospital and blood was drawn.

Because [Appellant] did not refuse the blood test, the [o]fficer testified that he never read the warnings on the DL-26 form to [Appellant].

According to the [o]fficer, [Appellant] was taken to the Conneaut Lake Regional Police Station, where the [o]fficer read [Appellant] the *Miranda* warnings from a gold card that he carries with him. Ultimately, the [o]fficer said he took no statement from [Appellant]. The [o]fficer never discussed with [Appellant] possible consequences for refusing a blood draw during their interaction.

Before [Appellant] was released into the custody of his significant other and another woman, the [o]fficer testified that he told [Appellant] he would retain his firearm until he came back for it when he was sober.

When asked by defense counsel on cross-examination whether he recalled [Appellant] saying anything about possibly going to jail if he did not agree to the blood draw, the [o]fficer testified that he did not recall. He then stated that it was not in his report and normally something like that would have been in his report because of its significance. The [o]fficer did say that although he did not recall [Appellant] saying that, he may have said that.

The [o]fficer then testified that he did have a DL-26 form, which he would have read to [Appellant] had [Appellant] refused to allow a blood draw.

[Appellant] then testified that he had previously had a DUI about 10 years ago, and therefore, believed that he could go to jail if he refused to provide blood. He also testified that while at the scene where he was pulled over by the [o]fficer, the [o]fficer pulled a card out and started to read it. [Appellant] stated that he interrupted the [o]fficer while reading the card and asked the [o]fficer if that was the card that tells him that he will go to jail if he refused to give blood. [Appellant] then testified that the [o]fficer said yeah and that they would get to that later.

[Appellant] indicated that he was 17-years old and had his prior DUI, the Pennsylvania State Police had read the consequences of refusal to him, and he gave blood; so [Appellant] was aware of the procedure. It was also [Appellant]'s recollection that the *Miranda* statute warnings were read to him after the PBT test was administered, in front of the police cruiser where he had been pulled over.

On cross-examination, [Appellant] admitted that he had several drinks and was over the legal limit. He indicated he should not have been driving. Further, he indicated that he remembered the conversation he had with the [o]fficer "vaguely well." [Appellant] further testified that he was never told that he would lose his license if he refused the blood test, nor that he would go to jail if he refused the blood test.

Trial Court's Findings of Facts, Conclusions of Law and Order, 2/14/17, at 1-3 (citation omitted).

The suppression court denied Appellant's motion, noting that Appellant "clearly and articulately consented voluntarily to the blood draw," *id.* at 4, and that his consent to the blood draw "was in fact voluntarily and knowingly given by unconstrained choice and not the result of duress, coercion, or a will overborne." *Id.* at 6.

After the suppression court denied his motion to suppress, on June 30, 2017, Appellant proceeded to a bench trial, after which he was convicted of violating 75 Pa.C.S.A. § 3802(a)(1), (c) (DUI - general impairment, and highest rate of alcohol) and 75 Pa.C.S.A. § 3334(b) (relating to turning movements and required signals). On October 5, 2017, Appellant was sentenced to, *inter alia*, sixty months of intermediate punishment, which accounted for Appellant's two prior DUI offenses. Appellant filed a motion for reconsideration, which the trial court granted in part (not relevant to the instant appeal), and denied in part. This appeal followed.

On appeal, Appellant, relying on **Birchfield** and 75 Pa.C.S.A. § 1547(b)(2),[2] argues that the blood test results had to be suppressed

---

[2] Section 1547(b)(1)-(2), in relevant part, reads as follows:

Civil penalties for refusal.--

(1) If any person placed under arrest for a violation of section 3802 is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, the department shall suspend the operating privilege of the person as follows:

. . . .

(2) It shall be the duty of the police officer to inform the person that:

(i) the person's operating privilege will be suspended upon refusal to submit to chemical testing and the person will be subject to a restoration fee of up to $2,000; and

because: (i) his consent to the blood draw was not voluntary, but coerced based on his own knowledge of DUI law, and (ii) the officer failed to inform Appellant of the consequences resulting from failure to the take a chemical test.

We review a denial of a motion to suppress based on the following standard:

> [O]ur standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

***Commonwealth v. Singleton***, 169 A.3d 79, 82 (Pa. Super. 2017) (citations omitted).

> "The Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from unreasonable searches and seizures." ***Commonwealth v. McAdoo***, 46 A.3d 781, 784 (Pa. Super. 2012). "A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless

---

(ii) if the person refuses to submit to chemical breath testing, upon conviction or plea for violating section 3802(a)(1), the person will be subject to the penalties provided in section 3804(c) (relating to penalties).

75 Pa.C.S.A. § 1547(b)(1)-(2).

- 6 -

an established exception applies." ***Commonwealth v. Strickler***, 563 Pa. 47, 757 A.2d 884, 888 (2000). "Exceptions to the warrant requirement include the consent exception, the plain view exception, the inventory search exception, the exigent circumstances exception, the automobile exception . . ., the stop and frisk exception, and the search incident to arrest exception." ***Commonwealth v. Dunnavant***, 63 A.3d 1252, 1257 n.3 (Pa. Super. 2013).

The "administration of a blood test . . . performed by an agent of, or at the direction of the government" constitutes a search under both the United States and Pennsylvania Constitutions. ***Commonwealth v. Kohl***, 532 Pa. 152, 615 A.2d 308, 315 (1992); ***Schmerber v. California***, 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Since the blood test in the case at bar was performed without a warrant, the search is presumptively unreasonable "and therefore constitutionally impermissible, unless an established exception applies." ***Strickler***, 757 A.2d at 888.

***Commonwealth v. Evans***, 153 A.3d 323, 327-28 (Pa. Super. 2016).

"One such exception is consent, voluntarily given." ***Strickler***, 757 A.2d 888 (citation omitted). Under the Fourth Amendment, where an encounter between law enforcement is lawful, voluntariness of consent to a search becomes the exclusive focus. ***Id.***

As noted above, Appellant first contends that his consent was not voluntary because it was made with the knowledge of increased penalties for refusal. The same coercion measure was fatal to ***Birchfield***, according to Appellant. Appellant's argument is meritless.

"***Birchfield*** makes plain that the police may not **threaten** enhanced punishment for refusing a blood test in order to obtain consent, [***Birchfield***,] 136 S.Ct. at 2186; whether that enhanced punishment is (or can be)

ultimately imposed is irrelevant to the question whether the consent was valid." *Commonwealth v. Ennels*, 167 A.3d 716, 724 (Pa. Super. 2017) (emphasis in original). Thus, the mere existence of legislation that imposed criminal penalties for refusal, absent an actual threat, does not amount to coercion or invalidate the consent given. Here, as noted above, the suppression court found that "[Appellant] . . . testified that he was never told that he would lose his license if he refused the blood test, nor that he would go to jail if he refused the blood test." Trial Court's Findings of Facts, Conclusions of Law and Order, 2/14/17, at 3. Because, as acknowledged by Appellant, there was no threat, there cannot be coercion. Thus, Appellant's reliance on *Birchfield* is misplaced. *See Commonwealth v. Smith*, 177 A.3d 915 (Pa. Super. 2017) (*Birchfield* did not apply because the arresting officer never told the defendant that he would be subjected to greater criminal penalties if he refused the blood-draw).

To the extent Appellant, on direct examination, "stated that he interrupted the [o]fficer while reading the card and asked the [o]fficer if that was the card that tells him that he will go to jail if he refused to give blood," *id.* at 3, to which the officer, according to Appellant, replied "yeah," the trial court credited the officer's recollection of the events on the night, which did not include any discussion between Appellant and officer concerning the consequences of refusal. It is well-established that it is not our role to make credibility determinations, reweigh the evidence, or resolve conflicts in the

testimony. Accordingly, the trial court's findings, which are supported by the record, will not be disturbed. ***See***, ***e.g.***, ***Commonwealth v. Clemens***, 66 A.3d 373, 378 (Pa. Super. 2013) ("It is within the suppression court's sole province as fact finder to pass on the credibility of witnesses and the weight to be given their testimony'); ***Commonwealth v. Camacho***, 625 A.2d 1242, 1245 (Pa. Super. 1993) (because "credibility at a suppression hearing is an important determination best resolved through the court's personal observations, we will not reverse a suppression court's assessment of credibility absent clear and manifest error").

Appellant next argues that the officer should have warned him of the consequences of refusal, relying on 75 Pa.C.S.A. § 1547(b)(2).

Section 1547 presupposes an officer "requested" a driver to submit to chemical testing, that the driver "refuses to do so," ***see*** Section 1547(b)(1) and, upon refusal, the arresting officer must provide the warnings set forth in Section 1547(b)(2). ***See***, ***generally***, ***Commonwealth v. Barr***, 79 A.3d 668 (Pa. Super. 2013). As noted above, this is not the case here. Appellant was not requested to take a blood test,[3] he was not threatened with harsh penalties (whether civil or criminal) if he were to refuse to take the blood test, and he did not refuse to take the blood test. To the contrary, because

---

[3] "[T]he [o]fficer asked [Appellant] if he would consent to a blood test, and [Appellant] said he would." Trial Court's Findings of Facts, Conclusions of Law and Order, 2/14/17, at 2.

Appellant consented to the blood test, the conversation between the officer and Appellant never reached the point of discussing the consequences of refusal. Indeed, the trial court noted that "[b]ecause [Appellant] did not refuse the blood test, the [o]fficer . . . never read the warnings on the DL-26 form to [Appellant]." Trial Court's Findings of Facts, Conclusions of Law and Order, 2/14/17, at 1.

Even if Section 1547 were violated, as Appellant alleges, the consequence would be the inapplicability of the enhanced penalties for refusal – which were not applied here.

In *Commonwealth v. Xander*, 14 A.3d 174 (Pa. Super. 2011), we held that the warnings under Section 1547(b) were indeed components of a valid "refusal," noting:

> the General Assembly specifically included a requirement in § 1547(b)(2)(ii) that the police warn arrestees of the enhanced penalties for a refusal [of chemical testing. Therefore,] **a "refusal" for purposes of § 3804(c) necessarily requires a knowing refusal insofar as the police must have provided the arrestee with the warnings beforehand.**
>
> . . . .
>
> **[The arresting officer] was required to provide [defendant] with § 1547(b) warnings before [defendant] could receive the enhanced penalties for DUI pursuant to § 3804(c).**

*Id.* at 179 (internal quotations and citations omitted) (emphasis added). Because Xander had not been warned of the consequences of refusing a blood draw, we affirmed the trial court's order granting Xander's motion for judgment of acquittal on the enhanced penalty pursuant to 75 Pa.C.S.A.

- 10 -

§ 3804(c). In light of the foregoing, Section 1547(b)(2) provides no relief to Appellant.

Ultimately, therefore, the instant appeal hinges on whether Appellant validly consented to the blood draw. As explained below, we conclude Appellant validly consented to the blood draw.

Our Supreme Court has applied the following standard to determine whether an individual has validly consented to a chemical test:

> In determining the validity of a given consent, the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances. The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent. Such evaluation includes an objective examination of the maturity, sophistication and mental or emotional state of the defendant. Gauging the scope of a defendant's consent is an inherent and necessary part of the process of determining, on the totality of the circumstances presented, whether the consent is objectively valid, or instead the product of coercion, deceit, or misrepresentation.

*Commonwealth v. Smith*, 77 A.3d 562, 573 (2013) (internal citations and quotation marks omitted).

Of all the circumstances surrounding his consent to the blood test, Appellant's challenge is limited to the effects of his professed knowledge of DUI laws. In his view, because he knew enhanced penalties would apply if he were to refuse a blood draw, he did not really have a choice other than agreeing to the test. His consent, in other words, was coerced. We disagree.

- 11 -

The suppression court found that there were circumstances surrounding the interaction militating in favor of a finding of coercion.[4]  On balance, however, the suppression court found that the non-coercive elements[5] outweighed the coercive elements, and that in fact Appellant consented to the blood test "voluntarily and knowingly given by unconstrained choice and not the result of duress, coercion, or a will overborne."  Trial Court's Findings of Facts, Conclusions of Law and Order, 2/14/17, at 6.

Similarly, our review of the exchange between the officer and Appellant shows no evidence, whether by words or conduct, suggesting coercion by the officer.  Similarly, there is no indication of any other circumstance surrounding the interaction that would suggest Appellant's free will was overborne.  To the

---

[4] The suppression court named the following coercive circumstances surrounding the interaction leading to the consent: Appellant gave consent at a late hour; was under arrest at the time he consented to the blood test; may have been emotional about an argument he had with his significant other; and, was not told of his ability to refuse the test.  Trial Court's Findings of Facts, Conclusions of Law and Order, 2/14/17, at 5.

[5] Regarding the non-coercive circumstances, the suppression court named the following: Appellant is an adult male of seemingly average intelligence, with some experience with the criminal justice system; consent was given not at the hospital, but on the scene; officer did not pose intimidating line of questions or statements that would intimidate Appellant; the officer's demeanor and expression were not coercive; officer did not employ aggressive or abusive tactics; the interaction appeared to be one of cooperation; there was only one officer at the scene; Appellant admitted he had been drinking large amounts of alcohol before driving. Trial Court's Findings of Facts, Conclusions of Law and Order, 2/14/17, at 5-6.

extent Appellant's knowledge of the law about refusal might have played a role in consenting to the test, and to the extent that Appellant's understanding of the law is relevant,[6] there is nothing in the record that would suggest that such knowledge overborne his will.

In light of the foregoing, we conclude that the suppression court did not err in denying Appellant's motion to suppress the blood test results.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/23/2018

---

[6] In **Commonwealth v. Johnson**, -- A.3d ----, 2018 WL 2295895 (Pa. Super. 2018) we reiterated that defendant's ignorance of the law, *i.e.* **Birchfield** and its implications, did not operate to invalidate defendant's consent to the blood test.