J-A12002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| TERRELL LARON WALKER, DAMAIRE WALLACE, QUASHAAD RODNEY JAMES AND MAURICE TOWNER, JR., | |
| Appellees | No. 2299 EDA 2015 |

Appeal from the Order Entered June 30, 2015
In the Court of Common Pleas of Bucks County
Family Court at No(s):
CP-09-CR-0000100-2105
CP-09-CR-0000101-2015
CP-09-CR-0000102-2015
CP-09-CR-0000103-2015

BEFORE:  BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:              **FILED SEPTEMBER 20, 2018**

The Commonwealth appeals from the consolidated order granting suppression of physical evidence seized in the cases of four codefendants, Terrell Laron Walker (100-2015), Damaire Wallace (101-2015), Quashaad Rodney James (102-2015), and Maurice Towner, Jr. (103-2015) (collectively hereinafter, "Appellees").  After careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

The Commonwealth charged Appellees at separate dockets with numerous offenses related to an armed robbery that occurred on the morning of October 26, 2014, at the Glen Hollow Apartments on Newportville Road in Bristol Township, Pennsylvania. Appellees filed suppression motions on March 6, 2015, and a suppression hearing was held on March 20, 2015.[1] The suppression court granted Appellees' motions to suppress by order dated June 30, 2015. The Commonwealth filed the instant, timely appeal on July 27, 2015. The Commonwealth then filed a timely, court-ordered Pa.R.A.P. 1925(b) statement on August 20, 2015. The suppression court issued its Rule 1925(a) opinion on September 28, 2015.

On August 26, 2015, this Court issued a *per curiam* order to show cause why this appeal should not be quashed, as the Commonwealth failed to file separate appeals for each Appellee. The Commonwealth filed a timely response on September 4, 2015. By *per curiam* order dated October 1, 2015, in consideration of the order to show cause and the Commonwealth's response thereto, this Court deferred the decision whether to quash this appeal to the argument panel.

On September 30, 2016, this Court issued a memorandum quashing the Commonwealth's appeal on the basis that the Commonwealth had failed to file separate appeals for each appellee. ***See Commonwealth v. Walker***,

---

[1] The trial court does not indicate whether separate motions were filed by each Appellee. However, the dockets of Appellees' individual cases reveal that separate, individual motions were filed, which were addressed at a consolidated suppression hearing.

2016 WL 5845208 (Pa. Super 2016) (unpublished memorandum). The Commonwealth filed a timely petition for allowance of appeal to our Supreme Court, which the Court granted by order dated July 24, 2017. *See Commonwealth v. Walker*, 158 A.3d 192 (Pa. 2017) (granting petition of allowance of appeal). In an opinion dated June 1, 2018, our Supreme Court, although agreeing with this Court's analysis that separate appeals were required, nevertheless vacated our disposition to quash the Commonwealth's appeal under the specific circumstances of this case. *See Commonwealth v. Walker*, 2018 WL 2448643 (Pa. June 1, 2018) ("While we do not quash the present appeal in this instance, in future cases [Pa.R.A.P.] 341(a) will, in accordance with its Official Note, require that when a single order resolves issues arising on more than one lower court docket, separate notices of appeal must be filed. The failure to do so will result in quashal of the appeal."). Accordingly, the Supreme Court remanded to this Court for a decision on the merits, which we address as follows.

The Commonwealth presents the following question for our review: "Did the Suppression Court err in granting suppression where the police possessed reasonable suspicion to stop Appellees' vehicle based on the totality of the circumstances?" Commonwealth's Brief, at 4.[2]

---

[2] We note that the Commonwealth raised two separate and distinct claims in its Rule 1925(b) statement. The Commonwealth's statement of the question involved mirrors the first claim presented in its Rule 1925(a) statement.

Our standard of review in addressing a challenge to the suppression court's granting of a suppression motion is well settled.

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

**Commonwealth v. Miller**, 56 A.3d 1276, 1278–1279 (Pa. Super. 2012) (citations omitted). "Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions." **Commonwealth v. Brown**, 606 Pa. 198, 996 A.2d 473, 476 (2010) (citation omitted).

**Commonwealth v. Korn**, 139 A.3d 249, 252–53 (Pa. Super. 2016), *appeal denied*, 159 A.3d 933 (Pa. 2016).

We begin our analysis with a review of the suppression court's factual findings, adduced from the March 20, 2015 suppression hearing, which the court provided as follows:

1. Officer Dennis Leighton is a police officer with the Bristol Township Police Department and has been so employed for 12 years. N.T.[,] 03/30/15, p. 20.

2. On October 25, 2014, Officer Leighton was on patrol in a marked police vehicle and received information broadcasted by Officer Sarcewicz that police were looking for a dark-colored

---

However, the Commonwealth has abandoned the second issue it raised in its Rule 1925(b) statement in light of the suppression court's Rule 1925(a) opinion. **See** Commonwealth's Brief at 26 n.1.

Nissan Murano with "possibly four black males in the vehicle." N.T.[,] 03/30/15, pp. 20-21.

3. Police were looking for the Nissan Murano because the occupants of the vehicle were suspects in an armed robbery at Glen Hollow apartments. N.T.[,] 03/30/15, pp. 20-21.

4. There was no license number transmitted by the dispatcher. N.T.[,] 03/30/15, p. 45.

5. There was no description of the occupants other than "four black guys." No physical description, age or article of clothing was provided. N.T.[,] 03/30/15, p. 46.

6. Forty-five minutes after receiving the radio call and while stopped at a red traffic light at the intersection of Lakeland Avenue and Bristol Oxford Valley Road, Officer Leighton observed what he believed to be a Nissan Murano making a left-hand turn onto Lakeland Avenue directly in front of his headlights. N.T.[,] 03/30/15, pp. 46-47.

7. The intersection of Lakeland Avenue and Bristol Oxford Valley Road is located within four to five miles of Glen Hollow apartments. N.T.[,] 03/30/15, pp.46-47.

8. Officer Leighton believed that the vehicle he observed matched the broadcasted description of the Nissan Murano and contained at least three black male occupants. N.T.[,] 03/30/15, p. 22.

9. After passing in front of Officer Leighton's car, the vehicle began to accelerate. N.T.[,] 03/30/15, p. 22.

10. Officer Leighton made a U-turn and began to try and catch up with the vehicle as it travelled on Lakeland Avenue. N.T.[,] 03/30/15, pp. 22-24.

11. The vehicle illuminated its left-hand turn signal, then immediately put on a right–hand turn signal, then illuminated its left-hand turn signal again. When the vehicle reached the intersection of Lakeland Avenue and Forster Avenue, it began to make a right turn as the driver activated the right-hand turn signal. N.T.[,] 03/30/15, p. 25.

12. Officer Leighton was then able to call out the registration plate over the radio, and then activated his overhead lights while he was making the turn to follow the vehicle. N.T.[,] 03/30/15, p. 25. The display registration of the vehicle was JHA 7563. N.T.[,]

03/30/15, p. 61. The vehicle was not registered to any of the defendants. N.T.[,] 03/30/15, pp. 61-62.

13. While on Foster Avenue, the vehicle accelerated slightly into a left-hand turn onto Colonial Avenue. N.T.[,] 03/30/15, p. 26.

14. The vehicle traveled on Colonial Avenue, 25 to 30 yards and then pulled to the driver's side curb. N.T.[,] 03/30/15, p. 26.

15. The operator of the vehicle was not cited for any motor vehicle violation. N.T.[,] 03/30/14, pp. 64-65.

16. Officer Leighton pulled up behind the vehicle and exited his police vehicle. Officer Leighton observed that the driver was paying close attention to what was going on behind him and the other occupants of the vehicle were dipping their shoulders. N.T.[,] 03/30/15, pp. 26-28.

17. As Officer Leighton waited for other officers to arrive, he stood outside his driver's side door approximately a car-length and a half from the stopped vehicle. Other officers were already in route to his location and arrived in seconds. N.T.[,] 03/30/15, pp. 28-29.

18. By this point, Officer Leighton identified the vehicle as a gray Ford product. N.T.[,] 03/30/15, pp. 29, 69.

19. Officer Leighton was unable to recall when he determined the vehicle was a Ford Escape. N.T.[,] 03/30/15, p. 37. However, the word "Escape" was on the rear hatch of defendant's vehicle. N.T.[,] 03/30/15, p. 40.

20. The driver complied with the officers' request to remove the keys from the ignition and drop them outside the driver's side window. The driver continued to comply with the officers by reaching out the window with both hands, opening the door from the outside, and exiting the vehicle, facing away from the officers. N.T.[,] 03/30/15, p. 30.

21. The driver walked backwards toward the officers until Officer Leighton asked him to stop and place his hands on the back of his head. Officer Leighton then handcuffed the driver and advised him that he was not under arrest at this time. N.T.[,] 03/30/15, pp. 30-31.

22. Officers then removed the other three occupants from the vehicle and handcuffed them in a similar fashion, advising all that

they were not under arrest at this time. N.T.[,] 03/30/15, pp. 31-34.

23. Roughly ten to twenty minutes after the vehicle stop, Officer Sarcewicz arrived at the scene to do a victim identification. N.T.[,] 03/30/15, p. 38.

24. The occupants of the vehicle were removed from the police vehicles for the identification and then seated back into police vehicles. N.T.[,] 03/30/15, p. 36.

25. The vehicle was secured as evidence and towed back to the Bristol Township Police Department. N.T.[,] 03/30/15, p. 35.

26. A subsequent search of the Ford Escape resulted in a seizure of various items alleged to have been related to the robbery at Glen Hollow Apartments.

Suppression Court Opinion ("SCO"), 9/28/15, at 2-4.

Based on these facts, the suppression court determined that Officer Leighton lacked reasonable suspicion to stop the vehicle. *Id.* at 7, 9. The Commonwealth argues that, *inter alia*, Officer Leighton possessed reasonable suspicion to stop Appellees' vehicle based on similarities between it and the information he received immediately following the robbery. We disagree.

> While warrantless seizures such as a vehicle stop are generally prohibited, they are permissible if they fall within one of a few well-delineated exceptions. ***Commonwealth v. Chase***, … 960 A.2d 108, 112–13 ([Pa.] 2008). One such exception allows police officers to detain individuals for a brief investigation when they possess reasonable suspicion that criminal activity is afoot. ***Commonwealth v. Strickler***, … 757 A.2d 884, 889 ([Pa.] 2000); ***Terry*** [***v. Ohio***], 392 U.S. [1,] 30 [(1968)]. Reasonable suspicion is a less stringent standard than probable cause necessary to effectuate a warrantless arrest, and depends on the information possessed by police and its degree of reliability in the totality of the circumstances. In order to justify the seizure, a police officer must be able to point to "specific and articulable facts" leading him to suspect criminal activity is afoot. [***Commonwealth v.***] ***Melendez***, 676 A.2d [226,] 228 [(Pa. 1996)] (citing ***Terry***, [392 U.S.] at 21…). In assessing the totality of the circumstances,

- 7 -

courts must also afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience and acknowledge that innocent facts, when considered collectively, may permit the investigative detention.

***Commonwealth v. Brown***, 996 A.2d 473, 476–77 (Pa. 2010).

Furthermore, a

police officer need not personally observe unusual or suspicious conduct reasonably leading to the conclusion that criminal activity is afoot and that a person is armed and dangerous; this Court has recognized that "…a police officer may rely upon information which is broadcast over a police radio in order to justify an investigatory stop." In such cases, the factors that must be considered in justifying an investigatory stop and subsequent frisk include the specificity of the description of the suspect in conjunction with how well the suspect fits the given description, the proximity of the crime to the sighting of the suspect, the time and place of the confrontation, and the nature of the offense reported to have been committed.

***Commonwealth v. Jackson***, 519 A.2d 427, 430 (Pa. Super. 1986) (citations omitted).

Here, the suppression court determined that Officer Leighton's "personal observations cannot be said to correspond to the facts communicated by the radio bulletin" broadcast by Officer Sarcewicz. SCO at 8. As noted, *supra*, Officer Leighton was looking for a dark-colored Nissan Murano with four African American occupants. He stopped a "silver/grey Ford Escape", with what he believed to be three African American occupants.[3] ***Id.*** at 7. Moreover, the suppression court opined that:

---

[3] Officer Leighton did not observe the fourth occupant until after the seizure in question occurred.

- 8 -

[T]he time and distance between the robbery at Glen Hollow Apartments and the investigatory stop by Officer Leighton strike against the existence of any reasonable suspicion. The stop occurred forty-five minutes after the robbery, approximately four to five miles away from the apartment complex. Considered alongside the fact that none of Officer Leighton's personal observations aligned with the information communicated over police radio, it is doubtful that the Officer possessed any specific and articulable facts that warranted the intrusion of Appellees' vehicle. Simply put, the situation presented to the Officer involved an incorrect model vehicle, that was an incorrect color and was occupied by a seemingly incorrect number of passengers, that he observed obeying all traffic laws nearly five miles from the location of a robbery that occurred forty-five minutes prior. Pennsylvania law requires more before an investigatory stop can be justified.

*Id.* at 9.

Regarding the vehicle's description, the Commonwealth argues that:

Officer Leighton saw a vehicle which was similar to the vehicle description that he received. The description that Officer Leighton has was that he was looking for a dark-colored SUV, possibly a Nissan Murano. As he was sitting at the intersection, he saw a dark-colored SUV pass in front of him which he believed to be a Nissan Murano. As it was nighttime, he believed the SUV to be blue, which is a dark color, but later found out that the color was in fact dark gray. Whether the SUV was blue or dark gray, the notable information is that he was looking for a dark-colored SUV—a description which the SUV Officer Leighton pulled over fit.

Commonwealth's Brief at 22-23.

Presently, the Commonwealth appears to be simply contradicting the factual findings of the suppression court, which determined that the vehicle stopped by the Officer neither matched nor substantially matched the description of the vehicle he was looking for. We may not substitute one party's version of the facts for the suppression court's where the suppression court's version is adequately supported by the record. **See Korn**, **supra**.

- 9 -

Here, the Commonwealth fails to demonstrate, by explicit reference to the record from the suppression hearing, how or why the trial court's version lacks support in the record. To the contrary, we conclude that the trial court's version is supported by the record, as was demonstrated by the court's detailed summation of the facts with direct references to the portion of the suppression hearing from which they were surmised.

Furthermore, common experience tells us that, in general, many passenger vehicles on the road share similar body styles and sizes. However, to justify a *Terry* stop of a vehicle based on a description over a police bulletin, an officer must provide *specific and articulable* facts that the vehicle actually matches, or at least substantially matches, the description provided. Here, Officer Leighton got all the specifics wrong: the make, the model, and the color of the vehicle, as well as the observed number of occupants. These differences are exacerbated by the fact that Appellees were not stopped within close temporal or spatial proximity to the robbery. The Commonwealth also seems to suggest that darkness justified the officer's lack of precision. This argument is specious, and merely emphasizes the unreliability of the officer's observations in the circumstances of this case.

The Commonwealth references only two cases in support of its arguments, *Commonwealth v. Berrios*, 263 A.2d 342 (Pa. 1970), and *U.S. v. Jaquez*, 421 F.3d 338 (5th Cir. 2005), presumably because those cases

were addressed by the suppression court in its opinion.[4] We agree with the Commonwealth that **Berrios** is not instructive in this matter as it involved both factual and legal circumstances that were substantially different from the instant matter.[5] However, we disagree with the Commonwealth's assertion that **Jaquez** does not provide any persuasive support for the suppression court's reasoning in this case.[6]

> In **Jaquez**,
>
> Abilene Police Officer Jennifer Holderead was on patrol when she received a call on her police radio that gun shots had been fired in the area of 10th and Pine Streets in Abilene, Texas, a high crime area. The dispatcher indicated only that "a red vehicle" was involved in the incident.
>
> Some 15 minutes later, Holderead observed a red car traveling away from the area where the shots were reported to have been fired. She stopped the car and told the driver, Jaquez, that she had pulled him over because his car matched the description of a vehicle involved in a report of gun fire in the area.
>
> …
>
> The facts are undisputed that at the time she pulled Jaquez over, Holderead knew only that "a red vehicle" had been involved

---

[4] These cases were, apparently, cited by Appellees below, and the suppression court found them to instructive in its opinion. **See** SCO at 8-9. In its brief, the Commonwealth seeks to distinguish those cases from the facts of the instant case.

[5] **Berrios** concerned two individuals stopped on a street, absent any prior complaint and, therefore, did not involve a search for a vehicle based on a police bulletin. **See Berrios**, 263 A.2d at 343. Additionally, the **Berrios** Court analyzed that police/citizen encounter as a **Terry** search, not a **Terry** seizure. **Id.**

[6] We recognize that **Jaquez** is not binding on the courts of this Commonwealth. However, because the suppression court cited **Jaquez** for its persuasive value, we will consider it for the same.

- 11 -

in a reported incident approximately 15 minutes earlier, in the same general area where she first spotted the car. Except for its color, she did not have any particular information about the vehicle, such as its make or model, or any description of its occupant(s).

*Jaquez*, 421 F.3d at 340-41. Consequently, the 5th Circuit held that the "sparse and broadly generic information provided by the dispatcher, without more, was insufficient to support a determination of reasonable suspicion, as required under *Terry*." *Id.* at 341.

Instantly, the Commonwealth is correct that the dispatcher in this case provided a more detailed description of the vehicle and its occupants than was present in *Jaquez*. However, that is not determinative of whether Officer Leighton possessed reasonable suspicion to stop Appellees' vehicle. In *Jaquez*, the officer stopped a vehicle that actually matched the vague description provided by the dispatcher. Here, Officer Leighton stopped a vehicle that did not match the description provided by the dispatcher with respect to the make, model, and color of the vehicle, and also with respect to the number of occupants he initially observed therein. Thus, the additional detail provided in this case is offset by the failure of the officer to stop a matching vehicle.

Moreover, while Officer Holderead stopped Jaquez travelling away from the reported gunshots a mere fifteen minutes after they were reported, in this case, Officer Leighton stopped Appellees forty-five minutes after the dispatcher provided a description, and several miles away from the scene of the crime. Thus, for every additional detail providing support for a *Terry* stop

- 12 -

in this case, as compared to *Jaquez*, there were *at least* as many countervailing factors suggesting that a *Terry* stop was not justified.

We conclude, therefore, as follows: First, the record supports the facts cited by the suppression court. Second, we ascertain no legal error in the suppression court's application of those facts to the pertinent law. Accordingly, the Commonwealth's claim lacks merit.

Order *affirmed*.

Judge Panella joins this memorandum.

President Judge Emeritus Stevens concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/20/18