J-S55003-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                          :             PENNSYLVANIA
                                          :

             v.                              :
                                          :

RICHARD E. TOKARCIK, JR.         :
                                          :

        Appellant            :      No. 741 WDA 2018

Appeal from the Judgment of Sentence February 7, 2018
In the Court of Common Pleas of Jefferson County Criminal Division at
No(s): CP-33-CR-0000132-2017

BEFORE: MURRAY, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.:           **FILED OCTOBER 30, 2019**

Richard E. Tokarcik, Jr. (Appellant) appeals from the judgment of sentence imposed after a jury found him guilty of criminal attempt – statutory sexual assault, unlawful contact with a minor (relating to sexual abuse of children), criminal solicitation – child pornography, criminal attempt – corruption of minors, corruption of minors, and criminal use of a communication facility.[1] On appeal, Appellant challenges the trial court's denial of his suppression motion. After careful consideration, we affirm.

The trial court recounted the evidence presented at the suppression hearing as follows:

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 901(a)/3122.1(b), 6318(a)(5), 902(a)/6312(d), 901(a)/6301(a)(1)(i), 6301(a)(1)(i), 7512(a).

Officer [(Andrew)] Turnbull learned on January 6, 2017 that an individual going by the name "Adam" had been sending sexually explicit texts to three underage girls. He believed the texter to be an older man based on references he made to his penis and his claim to be of the same generation as a "62-year-old grandmother."

After attempting unsuccessfully to call the suspect, Turnbull began texting him as the 16-year-old "Jamie" and her [15]-year-old sister, "Sam." Two days later, after exchanging sexually explicit texts, among which the suspect described his genitalia, the "three" decided to arrange a meeting. The suspect initially suggested a rendezvous at "Diamond J" truck stop, which confirmed to Turnbull that the man [with whom] he was communicating was older since the truck stop had not been known by that name in the officer's lifetime, but the "three" ultimately agreed to meet at a location on the southeast side of Brookville. The suspect texted "Jamie" just after midnight on January 8 to say he was en route.

Once the suspect and his would-be "victims" had agreed on a destination, Turnbull updated Officer [(Justin)] Miller, who parked his patrol car on a street the suspect would have to pass on his way to meet "Jamie" and "Sam." Pursuant to the plan he had discussed with his colleague, Miller was planning to stop the suspect. He knew he was looking for an older model vehicle, which Turnbull had surmised from the suspect's references to the fact that it rattled and "did not even have a CD player."

Although the suspect expressed some reservations about the meet-up, he ultimately arrived in the borough and spoke with "Jamie" to advise her that he was at the carwash near Hilltop, a convenience market and gas station situated adjacent to the car wash. Though he had attempted to channel his best high-pitched female voice, Officer Turnbull was concerned that he had spoiled the ruse and immediately alerted Officer Miller.

Looking toward state route 322, Miller saw an older pick-up truck turning left onto Evans Street. He knew that the only places from which it could be coming were the car wash parking lot and a nearby dirt road. He also knew that the suspect had told Turnbull moments earlier that he was at the carwash and that the truck's direction of travel was consistent with where the unlawful encounter was scheduled to take place. Aware that traffic in

Brookville tended to be sparse at 1:18 a.m., therefore, the officer believed he was looking at the perpetrator's truck. He thus turned around at the carwash and, engaging his siren and emergency lights, stopped the vehicle on Ridge Avenue, a residential street lined with homes and illuminated by a street light.

Employing his employer's designated procedures for high-risk and felony stops, Miller exited the patrol vehicle, drew his gun, and, ordered the suspect, whom he later learned was [Appellant], to get out of the truck and lie face-down on the ground. His back to the officer the entire time, [Appellant] complied. He thus did not see that Miller had a gun. He testified, however, that he assumed as much from things he had seen on television.

Turnbull arrived a few minutes later and was quickly able to ascertain that [Appellant] was in fact an older man driving an older vehicle. He thus detained him for further investigation, which included checking him for weapons and placing him in handcuffs. Within moments of his arrival, Turnbull was helping [Appellant] to his feet and escorting him to the back of his own truck, where he took a seat on the bumper.

[After reading Appellant his *Miranda*[2] rights, Officer Turnbull asked Appellant] whether he knew what was going on[.] [Appellant] said he knew "they" had the messages, at which point Turnbull retrieved his cell phone and dialed the phone numbers from which "Jamie" and "Sam" had received the subject texts and recent phone call. Both phones rang from inside [Appellant]'s truck[.] . . . He completed that transaction by putting [Appellant] in the back of Miller's patrol cruiser . . . . A tow truck was then called to remove [Appellant]'s vehicle from the scene.

[Appellant] related a somewhat different scenario. He agreed that Officer Turnbull asked whether he knew what was going on and conceded that his answer may have been consistent with the officer's testimony. He testified, however, that he was never advised that he was under arrest; that neither officer spoke to him while he lay on the ground, during the few minutes he sat on his truck's bumper, or as he was placed into the police cruiser; and that [Officer Turnbull]'s first words to him were, "You have the right to remain silent," which he indicated were given only after

_____

2 *Miranda v. Arizona*, 384 U.S. 436 (1966).

he had been in the back seat for a few minutes, restrained not only by handcuffs, but also by the officer standing directly outside his closed door. He thus believed he was under arrest, he said, from the moment Officer Miller ordered him to exit his vehicle.

Trial Court Opinion on Omnibus Pretrial Motion, 9/28/17, at 1-3.

Following his arrest, Appellant was charged with numerous sex crimes. On September 22, 2017, Appellant filed a pre-trial motion to suppress evidence from his vehicle stop and subsequent detention. Appellant averred that Officers Miller and Turnbull placed him under arrest immediately upon stopping his vehicle and did not have probable cause to do so. On September 28, 2017, following a hearing, the trial court denied the motion.

On October 18, 2017, Appellant filed a motion to reconsider the denial of his suppression motion. In his motion, Appellant contested the veracity of Officer Turnbull's testimony that when he called the suspect's phone numbers during the stop, the phones in Appellant's vehicle rang. Appellant argued that the call logs for the cell phones recovered from his vehicle did not contain calls from Officer Turnbull at the time immediately preceding his arrest. Consequently, he asserted that the officers lacked probable cause to arrest him. The same day, the trial court denied Appellant's motion for reconsideration.

On October 19, 2016, a jury found Appellant guilty of the above-referenced crimes. On February 7, 2018, the trial court sentenced Appellant to an aggregate term of 10 to 20 years of incarceration. Appellant filed a

timely post-sentence motion, which the trial court denied on March 28, 2018.

This timely appeal followed.[3]

On appeal, Appellant presents the following issue for review:

Whether the record supports the trial court's finding that the facts and circumstances of Appellant's detention and arrest demonstrate Officers Miller and Turnbull initiated an investigatory detention based on reasonable suspicion which, through further investigation, confirmed their suspicions and evolved into probable cause to arrest Appellant?

Appellant's Brief at 5.

Appellant challenges the denial of his suppression motion. Our standard of review is as follows:

[An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court] is bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

*Commonwealth v. Mason*, 130 A.3d 148, 151-52 (Pa. Super. 2015) (quotations and citations omitted), *abrogated on other grounds*,

---

[3] Both the trial court and Appellant have complied with Pa.R.A.P. 1925.

***Commonwealth v. Hicks***, 208 A.3d 916 (Pa. 2019). Importantly, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. ***In re L.J.***, 79 A.3d 1073, 1087 (Pa. 2013).

It is well-settled that there are three categories of interactions between police and a citizen evaluated pursuant to Article I, Section 8 of the Pennsylvania Constitution:

> The first of these is a 'mere encounter' (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an 'investigative detention' must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or 'custodial detention' must be supported by probable cause.

***Commonwealth v. Downey***, 39 A.3d 401, 405 (Pa. Super. 2012) (citation omitted).

"To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave." ***Commonwealth v. Strickler***, 757 A.2d 884, 889 (Pa. 2000). In evaluating the totality of the circumstances, our focus is whether, "by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained." ***Id.*** at 889. In making this determination, no single factor dictates "the ultimate conclusion as to whether a seizure has occurred." ***Id.***

Appellant asserts that his encounter with the police constituted a custodial detention (*i.e.*, an arrest) because when Officer Miller encountered and approached him, he immediately drew his firearm, held Appellant at gunpoint, and had him lay on the ground. Appellant further contends that his encounter with the police was an arrest because when Officer Turnbull arrived, he handcuffed Appellant and read him his ***Miranda*** rights before having any kind of discussion with him. Thus, Appellant argues that the appropriate inquiry into whether his detention was lawful is whether the police had probable cause to arrest him.

"An encounter becomes an arrest when, under the totality of the circumstances, a police detention becomes so coercive that it functions as an arrest." ***Commonwealth v. Stevenson***, 894 A.2d 759, 770 (Pa. Super. 2006), ***abrogated on other grounds***, ***Hicks***, 208 A.3d 916. In ***Commonwealth v. Hannon***, 837 A.2d 551 (Pa. Super. 2003), we stated that "an arrest exists when (1) the police intended to take appellant into custody, and (2) appellant was subjected to the actual control and will of the police." ***Id.*** at 554. "This test is an objective test, and all circumstances must be viewed in the light of the reasonable impression conveyed to the person subjected to the seizure." ***Id.*** (quotations and citations omitted).

Significantly, this Court has explained that "[c]ourts analyze numerous factors to determine whether a detention has become an arrest." ***Stevenson***, 894 A.2d at 770. These factors include: "the cause for the detention, the

detention's length, the detention's location, whether the suspect was transported against his or her will, whether physical restraints were used, whether the police used or threatened force, and the character of the investigative methods used to confirm or dispel suspicions." ***Id.***

In ***Hannon***, we determined that following circumstances constituted an arrest:

> The facts indicate that the police drew their weapons, ordered appellant out of the car, immediately restrained him with handcuffs, searched him, placed him in a police vehicle, and eventually transported him to the police station where ***Miranda*** warnings were given and an interrogation took place. A person subjected to this seizure would reasonably believe that he was under the control of the police and that the police intended to take him into custody when he was ordered out of the car at gunpoint and restrained with handcuffs.

***Hannon***, 837 A.2d at 554.

Upon review, we agree that Appellant's encounter with the police constituted an arrest. The record reflects that when Officer Miller stopped Appellant's vehicle, he ordered Appellant "out [of his vehicle] at gunpoint and had him lay on the ground" until Officer Turnbull arrived. ***Id.*** at 15. When Officer Turnbull arrived several minutes later, he immediately handcuffed Appellant and read him ***Miranda*** rights. ***Id.*** at 42-43. During this time, neither officer attempted to further confirm or dispel their belief that Appellant was their suspect. ***See id.*** at 15, 42-43. Consequently, at this point, Appellant was subject to arrest. Officer Turnbull then asked Appellant if he "understood what was going on or why this was happening." ***Id.*** at 43. Officer

Turnbull testified that in response, Appellant "stated that he knew and that we had the messages." ***Id.***

Unlike the officers in ***Hannon***, Officers Miller and Turnbull did not put Appellant in a police vehicle for transport to the police station prior to Appellant making incriminating statements. Officer Miller, however, held Appellant at gunpoint and had him on the ground for several minutes until Officer Turnbull arrived. Upon his arrival, Officer Turnbull immediately handcuffed Appellant, and then read Appellant his ***Miranda*** rights. As we stated in ***Hannon***, based on the totality of the circumstances, a person "would reasonably believe that he was under the control of the police and that the police intended to take him into custody when he was ordered out of the car at gunpoint and restrained with handcuffs." ***Hannon***, 837 A.2d at 554.

Moreover, it is well-settled that "the ***Miranda*** safeguards come into play whenever a person **in custody** is subjected to either express questioning or its functional equivalent." ***Commonwealth v. Gaul***, 912 A.2d 252, 255 (Pa. 2006) (emphasis added, quotations and citations omitted); ***Commonwealth v. Williams***, 941 A.2d 14, 30 (Pa. Super. 2008). "***Miranda*** warnings are necessary any time a defendant is subject to a custodial interrogation." ***Gaul***, 912 A.2d at 255. That ***Miranda*** warnings are not necessary in a situation where an individual is not under arrest further supports Appellant's position that he reasonably believed that he was under the control of the police and that the police intended to take him into custody. Therefore, based on the

totality of the circumstances, we conclude that the police officers' encounter with Appellant was a custodial detention, *i.e.*, an arrest. Accordingly, we must determine whether the police had probable cause to arrest Appellant. **See** **Downey**, 39 A.3d at 405.

Probable cause exists "where the facts and circumstances within the officers' knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." **Commonwealth** **v. Stultz**, 114 A.3d 865, 883 (Pa. Super. 2015). We have explained:

> In determining whether probable cause existed in a particular situation, **a court will look not just at one or two individual factors, but will consider the "totality of the circumstances" as they appeared to the arresting officer**:
>
> > When we examine a particular situation to determine if probable cause exists, we consider all the factors and their total effect, and do not concentrate on each individual element . . . . We also focus on the circumstances as seen through the eyes of the trained officer, and do not view the situation as an average citizen might . . . . Finally, we must remember that in dealing with questions of probable cause, we are not dealing with certainties. We are dealing with the factual and practical considerations of everyday life on which reasonable and prudent [persons] act.
>
> **Commonwealth v. Simmons**, 440 A.2d 1228, 1234 (Pa. Super. 1982), **quoting Commonwealth v. Kazior**, 410 A.2d 822, 824 (Pa. Super. 1979). It is only the probability, and not a *prima facie* showing, of criminal activity that is the standard of probable cause for a warrantless arrest. **Commonwealth v. Kloch**, 327 A.2d 375 (Pa. Super. 1974). Probable cause exists when criminality is one reasonable inference; it need not be the only, or even the most likely, inference. **See, e.g.**, **Commonwealth v. Kendrick**, 490 A.2d 923, 927 (Pa. Super. 1985) (probable cause "does not demand any showing that . . . a belief [of criminal activity] be correct or more likely true than false"); **Commonwealth v.** **Moss**, 543 A.2d 514, 518 (Pa. 1988) (in assessing sufficiency of

- 10 -

probable cause, the fact that other inferences could be drawn from circumstances does not demonstrate that inference that was drawn by police was unreasonable). **As Courts of this Commonwealth have repeatedly emphasized, determinations of probable cause "must be based on common-sense non-technical analysis**."

***Commonwealth v. Quiles***, 619 A.2d 291, 298 (Pa. Super. 1993) (*en banc*) (citations modified) (emphases added).

The trial court, concluding that Officers Miller and Turnbull had probable cause to arrest Appellant, explained:

> In light of the [1:00 a.m.] hour at which [Appellant] was apprehended, his text to "Jamie" that he was at the car wash, Officer Miller's contemporaneous sighting of [Appellant's] vehicle exiting the car wash parking lot, and Turnbull's ability to immediately identify the person lying on the pavement as an older man driving an older vehicle, it would have sanctioned the officer's actions had he taken [Appellant] into custody immediately.

Trial Court Opinion on Motion for Reconsideration, 10/18/17, at 2.

Our review of the record reflects that prior to Appellant's arrest, Officer Turnbull was attempting, while posing as an underage female, to arrange a meeting with the suspect, who was under the impression that the meeting would be for the purpose of engaging in sex with two underage females in Brookville, Jefferson County, Pennsylvania. N.T., 9/26/17, at 34-36. Officer Turnbull stated that the suspect indicated that his vehicle was rattling, making a lot of noise, and did not "even have a CD player," leading Officer Turnbull to believe the suspect was driving an older, run-down vehicle. ***Id.*** at 39-40. Officer Turnbull testified that at around 1:16 a.m., the suspect told him he

was at Henry's Car Wash in Brookville. *Id.* at 37-38. Officer Turnbull immediately relayed all of this information to Officer Miller. *Id.* at 7, 9-10.

Officer Miller testified that upon receiving the call from Officer Turnbull, he proceeded to Henry's Car Wash. *Id.* at 10-11. Officer Miller described the area of Henry's Car Wash as sparsely populated, with one or two other businesses that were closed and vacant, given that it was approximately 1:16 a.m. on January 6th. *Id.* at 8. Officer Miller indicated that there was no one else on the road, which was typical for that time of night and the frigid temperatures the area was experiencing. *Id.* at 8, 12. Officer Miller reported that roughly a minute later, as he approached Henry's Car Wash, he saw Appellant's 1989 Ford truck pulling out. *Id.* at 9, 11. Officer Miller stated that when he saw Appellant's truck, which appeared old and run-down, he "absolutely" knew he had located the suspect, and proceeded to make the traffic stop. *Id.* at 12-14.

After careful consideration, and "based on the totality of the circumstances as they appeared to the arresting officers," we conclude that Officers Miller and Turnbull had reason to believe Appellant was the suspect Officer Turnbull was investigating for sending sexually explicit texts to, and attempting to solicit, underage females. *Quiles*, 619 A.2d at 298 ("determinations of probable cause 'must be based on common-sense non-technical analysis'"). The officers knew from Officer Turnbull's communications with the suspect that the suspect was driving an older, run-

down vehicle. The suspect further communicated that he was waiting at Henry's Car Wash in Brookville — a sparsely populated area that was experiencing frigid temperatures at approximately 1:16 a.m. on Friday, January 6, 2017, when no one else was on the road — for the purpose of meeting with and engaging in sexual activity with two underage females. Upon arriving at Henry's Car Wash, Officer Miller observed Appellant, in a 1989 Ford Truck, leaving the area. In short, Officer Miller discovered Appellant in the exact location (the car wash), at the exact time (around 1:16 a.m.), communicated by the suspect. The encounter occurred during unfavorable weather conditions, at a time of day when no one else was around, making it highly unlikely that anybody but the suspect would be at that location at that time. On this record, the facts within the officers' knowledge were sufficient for a person of reasonable caution to believe — in Officer Miller's case, "absolutely" believe — that Appellant was the suspect sending sexually explicit texts to underage females, and driving to a car wash in the middle of a very cold January night to meet them for a sexual encounter. *See Stultz*, 114 A.3d at 883. Accordingly, we discern no error in the trial court's determination that the officers had probable cause to arrest Appellant, and the court's corresponding denial of Appellant's suppression motion.

Judgment of sentence affirmed.

Judge McLaughlin joins the memorandum.

Judge Colins concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/30/2019</u>