J-S04040-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DRON ADAMS | : | No. 3559 EDA 2018 |

Appeal from the Order Entered November 8, 2018
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0004690-2018

BEFORE:  BENDER, P.J.E., STABILE, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED MARCH 27, 2020**

The Commonwealth of Pennsylvania (Commonwealth) appeals from the order granting the suppression motion of Appellee, Dron Adams (Adams). After careful consideration, we affirm.

The suppression court summarized the evidence presented at the suppression hearing as follows:

On March 26th, 2018, at about 6:02pm, Sergeant Matthew Goldschmidt [(Sergeant Goldschmidt)] was driving in a fully marked police vehicle up the alley between the 300 block of Pennell Street and the 300 block of [Lloyd] Street while on routine patrol.  At the time of this incident, it was daylight.  Sergeant Goldschmidt patrols this area multiple times in one patrol shift, since it is a high drug and crime area.  This has been determined by the Chester City Police [as] a high crime area because there are numerous shootings and homicides a year in this area, as well as numerous drug sales and drug use arrests.  This alley in particular has many abandoned homes where drugs have been discovered.

As Sergeant Goldschmidt drove up the alley, he noticed a gray Nissan parked facing south, next to the garage of 319 Pennell Street, a home he believed to be abandoned, which had a history of housing illicit objects. Inside the vehicle in the front passenger seat was Ahmad Anding, a known drug dealer from the area. Sergeant Goldschmidt approached the vehicle, and once he got to the side of the vehicle, he noticed [Adams] crouching between the abandoned garage and the passenger door. Sergeant Goldschmidt had encounters with [Adams] previously on several drug cases, none of which resulted in a conviction. Sergeant Goldschmidt also knew that [Adams had] lived in the area, and that it would not be unusual for him to still know people that lived there now. When he noticed [Adams], Sergeant Goldschmidt turned around, but did not turn his lights and sirens on. Upon approach, [Adams] did not flee or provide any false information. When he questioned [Adams] as to his behavior, [Adams] immediately provided his identification, which confirmed his name and personal information. Upon reviewing [Adams'] information, it was determined that [Adams] had no outstanding warrants.

Sergeant Goldschmidt asked [Adams] if he had a weapon on him. [Adams] responded no and put his hands up, then Sergeant Goldschmidt testified that he gave him consent to search him. [] Sergeant Goldschmidt checked [Adams'] groin area and believed that he felt something in the inner thigh area. Sergeant Goldschmidt took [a] police scanner from [Adams'] pocket, turned it off, and placed it on the roof of the car. He then asked [Adams] to step to the rear of the vehicle, and for Anding to join him. The Sergeant testified that [Adams] gave him no indication that he had a weapon, did not threaten him, was not overly nervous, did not suggest that he was going to harm him in any way, and was entirely cooperative. As to his nerves, the Sergeant specifically noted that his nerves were nothing more than a normal interaction that he would have with anyone else.

Officers Taylor and Burger arrived as [] back-up [o]fficers in a marked police car, without lights or sirens. Sergeant Goldschmidt alerted Officer Taylor to the possibility of cocaine in [Adams'] pants, and he retrieved it. Officer Taylor then placed [Adams] into custody and seized the cocaine as evidence. In total, a little over $400, a police scanner, and cocaine were seized from [Adams].

Suppression Court Opinion, 8/2/19, at 2-4 (citations to notes of testimony omitted).

Adams was charged with possession of a controlled substance, manufacture or delivery of a controlled substance, and possession of drug paraphernalia.[1]  On September 6, 2018, Adams filed a pre-trial motion to suppress in which he argued that he was subjected to an investigatory detention unsupported by reasonable suspicion.  On October 15, 2018, the suppression court held a hearing.  On November 8, 2018, the suppression court granted Adams' motion, concluding that Sergeant Goldschmidt did not possess the requisite reasonable suspicion to subject Adams to an investigatory detention.  The Commonwealth timely appealed.[2]  Both the suppression court and the Commonwealth have complied with Pennsylvania Rule of Appellate Procedure 1925.

On appeal, the Commonwealth presents the two issues for review:

[1.] The sergeant approached [Adams] without activating his lights and siren, unholstering his firearm, threatening [Adams], or ordering him to move.  The sergeant merely approached [Adams] and asked him what he was doing and whether he possessed of [*sic*] a weapon.  In response, [Adams] provided his identification and invited the sergeant to frisk him.  Was this a mere encounter?

[2.] During the consensual frisk and without manipulating the item, the sergeant felt what he knew to be cocaine in [Adams']

---

[1] 35 P.S. §§ 780-113(a)(16), (30) and (32).

[2] The Commonwealth certified that the suppression court's November 8, 2018 order would terminate or substantially handicap the prosecution, pursuant to Rule 311(d) of the Pennsylvania Rules of Appellate Procedure.

pants. Did the sergeant lawfully seize the cocaine pursuant to the "plain feel" doctrine?

Commonwealth Brief at 2.

Our standard of review when the suppression court grants suppression is as follows:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Vetter*, 149 A.3d 71, 75 (Pa. Super. 2016), *appeal denied*, 169 A.3d 577 (Pa. 2017) (citations omitted). Importantly, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1087 (Pa. 2013).

The Commonwealth argues that Sergeant Goldschmidt's initial interaction with Adams was a mere encounter, and the sergeant did not need reasonable suspicion to frisk Adams when Adams consented to be frisked during the mere encounter. *See* Commonwealth Brief at 7. The Commonwealth states that the initial interaction amounted to a mere encounter "because the sergeant never activated his lights and siren; brandished his weapon; made an intimidating movement, overwhelming show of force, threat, or command; or prevented [Appellee] from walking away."

*Id.* In response, Adams argues that the "stop was not a mere encounter as the [C]ommonwealth intends, but an unconstitutionally impermissible investigative detention[.]" Adams' Brief at 11.

"The Fourth Amendment of the Federal Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures." ***Commonwealth v. Walls***, 53 A.3d 889, 892 (Pa. Super. 2012). "To secure the right of citizens to be free from such [unreasonable] intrusions, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive." ***Commonwealth v. Pratt***, 930 A.2d 561, 563 (Pa. Super. 2007). Courts in this Commonwealth have recognized three types of interactions between the police and a citizen: a mere encounter, an investigative detention, and a custodial detention.

> A mere encounter between police and a citizen need not be supported by any level of suspicion, and carr[ies] no official compulsion on the part of the citizen to stop or to respond. An investigatory stop, which subjects a suspect to a stop and a period of detention . . . requires a reasonable suspicion that criminal activity is afoot. A custodial search is an arrest and must be supported by probable cause.

***Commonwealth v. Newsome***, 170 A.3d 1151, 1154 (Pa. Super. 2017).

This Court has explained that when determining whether an interaction is a mere encounter or an investigative detention,

> the focus of our inquiry is on whether a seizure of the person has occurred. Within this context, our courts employ the following

objective standard to discern whether a person has been seized: [w]hether, under all the circumstances surrounding the incident at issue, a reasonable person would believe he was free to leave. Thus, a seizure does not occur simply because a police officer approaches an individual and asks a few questions.

***Commonwealth v. Cooper***, 994 A.2d 589, 592 (Pa. Super. 2010) (citations and ellipses omitted). "The pivotal inquiry is whether, in light of the facts and circumstances, a reasonable man, innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes." ***Commonwealth v. Hampton***, 204 A.3d 452, 458 (Pa. Super. 2019) (citation omitted).

The Commonwealth's contention that Sergeant Goldschmidt's interaction with Adams was not an investigative detention is belied by the suppression record. Sergeant Goldschmidt testified that upon seeing Adams crouched between a car and an abandoned garage, he drove to the end of the block, turned around, drove back, and stopped at Adams' location. N.T., 10/15/18, at 16-17. Exiting his marked police vehicle in full uniform, Sergeant Goldschmidt approached Adams and asked him what "he was doing [and] why he was crouched down behind the vehicle[.]" ***Id.*** at 17. In response to Sergeant Goldschmidt's questioning, Adams produced his driver's license and Goldschmidt examined his personal information.[3] ***Id.*** Sergeant Goldschmidt

---

[3] Sergeant Goldschmidt testified that although Adams produced his driver's license at the beginning of their interaction, ***see*** N.T., 10/15/18, at 17, he waited until after he questioned Adams about whether he possessed any weapons and additional officers arrived to check Adams' information to see if he had outstanding warrants. ***Id.*** at 66 ("I didn't actually run their names

then directed Appellee to step to the rear of the parked vehicle.[4] *Id.* at 20. At the same time, Sergeant Goldschmidt also instructed Mr. Anding to exit his vehicle and move to the rear of the car. *Id.* at 20.

Based on the totality of these circumstances, we conclude that a reasonable person would not have believed he was free to leave. *See Walls*, 53 A.3d at 893; *Cooper*, 994 A.2d at 592. The questions asked by Sergeant Goldschmidt, along with his directives for both Adams and Mr. Anding to move to the rear of the vehicle, would indicate to a reasonable person that he was under police control and suspected of criminal activity. *See Commonwealth v. Parker*, 161 A.3d 357, 363 (Pa. Super. 2017) (stating that indications that

---

until after Officer Taylor showed up."). Adams argues that the fact that Sergeant Goldschmidt "never handed back [Adams'] identification is indicia of a seizure." Adams' Brief at 15-16. While the record is unclear as to who possessed Adams' driver's license between the time he handed it to Sergeant Goldschmidt and the time Sergeant Goldschmidt used it to run a warrant check, we note our Supreme Court's recent decision in *Commonwealth v. Cost*, --- A.3d ----, 2020 WL 354975, (Pa. 2020), in which the Court held that, "[c]oupled with other relevant factors in the case, we conclude that the officer's or his partner's retention of Appellant's identification card to conduct a warrant check -- as he was asked if there was anything in his backpack that the officer needed to know about -- was sufficient to signify to a reasonable person that he was not free to proceed about his business." *Id.* at *10.

[4] While the suppression court's opinion states that Sergeant Goldschmidt asked Adams to move to the back of the vehicle **after** the weapons frisk was conducted, this factual finding is not supported by the record, and we are therefore not bound by it. *See* Suppression Court Opinion, 8/2/19, at 3; *Vetter*, 149 A.3d 71, 75. Conversely, Sergeant Goldschmidt's testimony supports a finding that he asked Adams to move to the rear of the vehicle prior to asking whether he possessed any weapons and searching him. *See* N.T., 10/15/18, at 20.

a defendant is suspected of criminal activity is a factor to consider as to whether a seizure has occurred).

Thus, once Sergeant Goldschmidt controlled Adams' movements by requesting he step to the back of the vehicle, and indicated that he suspected Adams of criminal activity, Adams was effectively seized. As we have stated, "[t]he reality of the matter is that when a police officer requests a citizen to do something, even something as simple as 'move along,' it is most often perceived as a command that will be met with an unpleasant response if disobeyed." *Commonwealth v. Reppert*, 814 A.2d 1196, 1203 (Pa. Super. 2002) (citation omitted). Therefore, "it would be disingenuous to assert that a reasonable person in [Adams'] shoes would have felt free to leave the scene had he wished to." *Id.* (citation omitted).

Based upon the suppression record, we conclude that Adams was effectively seized when Sergeant Goldschmidt requested he step to the back of the vehicle, and agree with the suppression court that Adams was subjected to an investigative detention. Thus, we must determine whether Sergeant Goldschmidt possessed the requisite reasonable suspicion to effectuate the detention.

"An investigatory detention is justified only if the detaining officer can point to specific and articulable facts which, in conjunction with rational inferences derived from those facts, give rise to a reasonable suspicion of criminal activity and therefore warrant the intrusion. *Hampton*, 204 A.3d at 459 (citation omitted). "The officer must be able to articulate something more

- 8 -

than an inchoate and unparticularized suspicion or hunch." **Id.** (citation omitted). Further, "[t]he determination of whether an officer had reasonable suspicion that criminality was afoot so as to justify an investigatory detention is an objective one, which must be considered in light of the totality of the circumstances." **Commonwealth v. Walls**, 53 A.3d 889, 893 (Pa. Super. 2012).

We conclude that Sergeant Goldschmidt lacked the reasonable suspicion necessary to subject Adams to an investigative detention because there was no evidence suggesting Adams was engaging in criminal conduct. Sergeant Goldschmidt's testimony focuses on Adams' location in a high crime area, Adams' crouched position in between the vehicle and the abandoned garage as he drove past, and Sergeant Goldschmidt's identification of Mr. Anding as a known drug dealer as reasons for his determination that he had reasonable suspicion to subject Adams to an investigative detention. N.T., 10/15/18, at 7-12.

However, Sergeant Goldschmidt testified that he did not witness Adams doing anything illegal, including conducting drug transactions. **Id.** at 31. Sergeant Goldschmidt stated that he observed Adams during daylight hours, in an area where he knew Adams used to live and would have known other individuals. **Id.** at 11, 51-52. Based on that information, Sergeant Goldschmidt testified that it would not be unusual for Adams to be in the area, and in fact, he saw Adams in that area frequently. **Id.** at 52.

Sergeant Goldschmidt also testified that after exiting his vehicle and initiating contact, Adams did not attempt to flee. N.T., 10/15/18, at 43. Rather, when the sergeant began to question Adams, Adams responded appropriately and handed Sergeant Goldschmidt his driver's license. *Id.* at 35-36. Sergeant Goldschmidt specifically testified that Adams did not appear overly nervous, and at no time gave any indication that he possessed a weapon. *Id*. at 43, 54. Sergeant Goldschmidt stated that Adams was not threatening toward him, and was cooperative during the interaction. *Id.* at 43.

Based on our careful review, and in light of the totality of the circumstances, Sergeant Goldschmidt did not have reasonable suspicion to support his investigative detention of Adams. Sergeant Goldschmidt specifically testified that he did not observe Adams and Mr. Anding engaging in illegal activity N.T., 10/15/18, at 31. Sergeant Goldschmidt further testified that when he drove past Adams and Mr. Anding, he did not "see any packaging or anything that looked like drugs in plain view." *Id.* By his own admission, Sergeant Goldschmidt did not observe Appellee participating in **any** illegal activity. *Id.* Sergeant Goldschmidt therefore failed to articulate something more than an unparticularized suspicion or hunch, and we therefore cannot conclude that he reasonably suspected criminal activity was afoot. *Hampton*, 204 A.3d at 459; *Newsome*, 170 A.3d at 1154. Accordingly, Sergeant Goldschmidt lacked reasonable suspicion to subject Adams to an investigatory detention, such that Adams was unlawfully detained.

Finally, the Commonwealth avers that Sergeant Goldschmidt "did not need reasonable suspicion because [Adams] provided [] valid consent to search during a mere encounter." Commonwealth Brief at 7. As we have determined that Adams was subjected to an unlawful detention, we must examine whether his consent to search was the product of the unlawful detention. The Pennsylvania Supreme Court has stated:

> Where . . . a consensual search has been preceded by an unlawful seizure, the exclusionary rule requires suppression of the evidence obtained absent a demonstration by the government both of a sufficient break in the causal chain between the illegality and the seizure of evidence, thus assuring that the search is not an exploitation of the prior illegality, and of voluntariness.

*Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa. 2000) (citations omitted). "The three [] relevant factors to be examined in determining whether an unlawfully detained individual's consent to search is an independent act of free will or the product of the illegal detention are the temporal proximity of the detention and the consent, any intervening circumstances, and particularly, the purpose and flagrancy of the officer's unlawful conduct." *Commonwealth v. Ayala*, 791 A.2d 1202, 1211 (Pa. Super. 2002) (citation omitted).

Here, Adams gave Sergeant Goldschmidt consent to search contemporaneously with the unlawful detention. *See* N.T., 10/15/18, at 20. We therefore cannot conclude that a sufficient break in the causal chain between the illegality and the seizure of evidence discovered during Sergeant

Goldschmidt's *Terry*[5] frisk of Adams exists. *Strickler*, 757 A.2d at 889. While the purpose of Sergeant Goldschmidt's *Terry* frisk was to check Adams for weapons, there were no intervening events between the consent Adams gave to search his person and the unlawful detention. Therefore, we are constrained to conclude that any consent given by Adams was the direct product of his unlawful detention and the exclusionary rule compels suppression. *See Strickler*, 757 A.2d at 889.

In sum, the suppression court properly granted Adams' motion to suppress because he was subjected to an unlawful detention, and Adams' consent to search was a direct product of the unlawful detention. We therefore affirm the grant of suppression.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/27/2020

---

[5] *Terry v. Ohio*, 392 U.S. 1 (1968).